Willie C. BYRD, Appellant,

v.

UNITED STATES, Appellee.

Nos. 89–CF–159, 90–CO–772.

District of Columbia Court of Appeals.

Argued Jan. 10, 1992.
Decided Aug. 14, 1992.

Lawrence M. Baskir, Washington, D.C., appointed by this court, for appellant.

Martin D. Carpenter, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas C. Black, and Gregory Jackson, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, SCHWELB, Associate Judge, and KERN, Senior Judge.

SCHWELB, Associate Judge:

Willie C. (Stink) Byrd was found guilty by a jury of possession of PCP and marijuana with the intent to distribute each of these controlled substances. D.C.Code § 33–541(a)(1) (1989). Byrd filed a motion for a new trial pursuant to D.C.Code § 23–110 (1988), arguing that his trial counsel had been constitutionally ineffective. Byrd's motion was based primarily on his attorney's failure to call two exculpatory witnesses (who had testified favorably to Byrd at the preliminary hearing) and to interview several others. After a hearing at which the essential facts were stipulated, the trial judge denied the motion, concluding that trial counsel's performance "fell below the standard of effectiveness," but that Byrd had failed to show prejudice. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Byrd has appealed separately from his conviction, No. 89–CF–159, and from the denial of his motion for a new trial, No. 90–CO–772. The two appeals have been consolidated. We are unpersuaded by Byrd's contention on his direct appeal that an evidentiary ruling by the judge constituted reversible error. See note 4, infra. We find merit, however, in Byrd's claim that he was denied the effective assistance of counsel. Concluding that Byrd has made a sufficient showing both of deficient performance and of prejudice, we vacate his convictions and order a new trial.

I

THE TRIAL

This is another "drop-see" case in which drugs worth a great deal of money were left on a street in a "high crime" and "high drug" area of Washington, D.C. The prosecution maintained that Byrd possessed the drugs in order to sell them. The defense claimed that Byrd had nothing to do with the contraband.

The principal government witness, Investigator Edward Howard of the Metropolitan Police Department, testified at trial that on August 8, 1987, he was operating an unmarked police car in the 5700 block of Ames Street in northeast Washington, D.C. He saw a man, later identified as appellant Byrd, come out of an alley which the police had under observation. According to Investigator Howard, Byrd, with whom Howard was not previously acquainted, recognized the unmarked car as a police vehicle,[1] immediately threw down a brown paper bag, and walked speedily away into a second alley. Investigator Howard recovered the brown bag, which was found to contain thirty-three packets of PCP mixed with marijuana. Byrd was promptly apprehended by other officers, one of whom testified that Byrd was carrying $304.00 in currency on his person.[2]

Byrd's defense consisted almost entirely of his own testimony.[3] He denied having possessed any drugs or having carried or discarded a brown bag. He stated that he did not recognize the unmarked police car and that he had not fled to avoid the police. He insisted, on the contrary, that he had run because he wanted to reach an ice cream truck at the other end of the alley before its imminent departure. Byrd was impeached with convictions of armed robbery, assault with a dangerous weapon, unlawful possession of marijuana, and shoplifting. His counsel called no exculpatory witnesses. The jury convicted Byrd of both charges, and he appealed his convictions to this court.[4]

## II

## THE POST–CONVICTION HEARING

In his post-conviction motion for a new trial pursuant to D.C.Code § 23–110 (1988), Byrd claimed that his trial counsel had been ineffective in that he failed to offer as defense witnesses Nathaniel Kirk and Kenneth Rogers, who had testified at the preliminary hearing that Byrd had not committed the offense. Byrd also alleged that defense counsel failed even to interview two other potential witnesses, Deirdre Johnson and John Deadwyler, whose written statements were attached to the motion.

At the hearing on the motion, Byrd had not been brought in from Lorton, but his

---

1. According to Investigator Howard, "I know that everyone up there in our area recognize[s] our vehicle[s] as jump-out vehicles." The two defense witnesses who testified at the preliminary hearing confirmed that they were able to recognize the unmarked cars. When asked by defense counsel what purpose unmarked vehicles served under these circumstances, Investigator Howard responded "because people ... run to the curb and throw a bag down."

2. Defense counsel deferred his opening statement until after the conclusion of the prosecution case. In the middle of that opening statement, he interrupted his own presentation and asked to approach the bench. At sidebar, he requested that the testimony about the money said to have been found on Byrd's person be stricken because the government had failed to prove the chain of custody. The judge granted the defense motion and told the jurors that "for a legal reason" he was striking all of the testimony in regard to the money, and that he was asking the jury, "even though it's hard to do," not to consider that testimony. This exchange came 47 transcript pages (more than a quarter of the trial) after the money was introduced.

   Although we decide the appeal on other grounds, we note once again the difficulties with such a directive:

   one cannot unring a bell; after the thrust of the saber it is difficult to say forget the wound; and finally, if you throw a skunk into the jury box, you can't instruct the jury not to smell it.

   *Thompson v. United States,* 546 A.2d 414, 425 (D.C.1988) (citations omitted).

3. As his only other witness, Byrd briefly recalled Investigator Howard and established through him that the brown bag was not tested for fingerprints.

4. In his direct appeal, No. 89–CF–159, Byrd contends that the trial judge committed reversible error by overruling an objection to a question which the prosecutor posed to Investigator Howard on redirect examination regarding the contents of the brown paper bag. He maintains that the question went beyond the scope of the cross-examination and that the judge failed to exercise his discretion. We discern neither abuse of discretion nor failure to exercise it. *Hairston v. United States,* 497 A.2d 1097, 1103 (D.C.1985), *see also Johnson v. United States,* 398 A.2d 354, 363–64 (D.C.1979). Moreover, even if there had been error, it was plainly harmless.

counsel waived his presence. The parties also learned that Byrd's trial counsel, who was to have been called as a witness by the prosecution, had retired from the practice of law, and was unable to testify because he was living abroad. The hearing was further simplified when the parties stipulated that for the purposes of the hearing, the court could treat the testimony of Kirk and Rogers at the preliminary hearing as the testimony which they would have given at trial.[5] The parties also stipulated that Ms. Johnson and Deadwyler would have testified in conformity with their written statements.

At the preliminary hearing, both Kirk and Rogers had testified that they were sitting on Ms. Johnson's porch and had witnessed the events which preceded Byrd's arrest from a distance which Kirk estimated as approximately thirty feet. Kirk, who described Byrd as a friend but not a close friend, stated that he recognized the "jumpout squad" because he had seen the officers' unmarked police car before. He testified, in pertinent part, as follows:

Q. Sir, what was Mr. Byrd doing other than walking when you first saw him this second time?

A. Wasn't doing anything but walking, just walking.

\*   \*   \*   \*   \*   \*

Q. Mr. Byrd was in front during the whole time you saw him or just part of the time?

A. The whole time I saw him.

Q. Okay. Was Mr. Byrd carrying anything?

A. No.

Q. Did Mr. Byrd leave with anything?

A. No.

Q. The first time you saw Mr. Byrd that day was he carrying anything?

A. No.

Q. Did he have his hands in his pocket or out of his pocket?

A. Out of his pocket.

After describing the recovery of the brown bag near a car in front of Ms. Johnson's house, Kirk continued as follows:

Q. All right. Did you see anybody throw that bag?

A. No, I didn't.

Q. Could Mr. Byrd have thrown that bag without your seeing it?

A. No.

On cross-examination, Kirk confirmed that Byrd ran when the "jumpouts" arrived; he said he did not know why Byrd did so. The testimony continued:

Q. But you are able to look at both the officers and Mr. Byrd?

A. My head was going both ways.

Q. So, in fact you didn't have your eyes on the defendant the entire time, did you?

A. No, I didn't.

Q. In fact if he had reached into his pocket and pulled out a bag and thrown it, you might not ... have seen that; is that correct?

A. That's correct.

Rogers' account was similar to Kirk's. He was able to observe the activity effectively because the "jumpout" car "pulled in front of the car in about the middle of us where we was sitting at." He, too, knew who the officers were "because I know the jumpout cars." Rogers stated that Byrd ran when the "jumpout[s] had jumped out," and that the officers looked in the grass for five or ten minutes before recovering the brown bag. He did not see Byrd, or anyone else, throw the bag.

On cross-examination, Rogers stated that he was "looking at Byrd" and "just happened to turn my head. And I happened to [see] the jumpout." When he first saw Byrd, Byrd had nothing in his hand. The testimony continued:

Q. I understand that. But before you saw him, before he came into your view or your turned towards him you have no idea what he had in his hands, do you?

---

5. Both men provided the defense with signed statements to the effect that they would have repeated at trial the accounts they gave at the preliminary hearing. These statements were filed with Byrd's motion.

A. I have no idea what he had in his hand. From my knowledge he didn't have nothing in his hand.

In her written statement, Deirdre Johnson related that on the evening in question she was on the porch with Kirk and Rogers. The three of them saw Byrd arrive; the police arrived a moment later. According to Ms. Johnson,

Willie didn't have a bag, and didn't throw or drop anything down. The police looked for 5 or 10 minutes until they found a bag under a car [she thinks].[6] They had looked all over the circle under bushes, cars, etc..... At the time it was a place where people stashed drugs and police would frequently come and search the circle for drugs. When they found drugs they would appear to charge the nearest person to the drugs.

John Deadwyler, the proprietor of the barbershop at which Byrd was employed, provided a signed statement in which he represented that

the money found in Willie C. Byrd's possession by police during his arrest on August 8th, 1987 belonged to the Superior Barber Shop.

The statement bore the printed stamp of the "SUPERIOR BARBER SHOP & UNISEX SALON."

### III

### THE TRIAL JUDGE'S DECISION

After hearing argument on Byrd's motion for a new trial, the trial judge delivered his decision orally from the bench. The judge found no ineffective assistance of counsel with respect to trial counsel's failure to call Deadwyler, since the defense had succeeded in excluding the money from evidence.[7] The judge also expressed some doubt as to the admissibility of Ms. Johnson's proposed testimony that police habitually arrested persons found nearest to discarded drugs. The judge found, however, that Kirk and Rogers would apparently have been available to defense counsel, and that his failure to call them "is an unexplained professional error and there are no justifiable excuses for it and the information was relevant and was right on point."

Turning to the question of prejudice—one which required a "very difficult decision"—the judge concluded that "a reasonable probability did not exist that, but for the error in ... failing to put on these two witnesses, the result of the trial would have been different." He based this conclusion on his perception that the prosecution case was a "very simple and strong case," and that "it's clear that [Kirk and Rogers] did not have their attention on Mr. Byrd 100% of the time ... during this transaction." [8]

### IV

### LEGAL ANALYSIS

*A. Basic Principles.*

Our discussion of the legal principles applicable to Byrd's claim that his counsel was ineffective in the constitutional sense must begin with the Supreme Court's seminal decision in *Strickland.* Briefly, under *Strickland,* Byrd must demonstrate both deficient performance and prejudice. With respect to the performance prong, courts will not readily second-guess a trial attorney's tactical decisions, and Byrd must show that his trial counsel "made errors so serious that [he] was not functioning as the 'counsel' guaranteed [him] by the Sixth

---

6. The text of Ms. Johnson's statement was apparently written by the defense investigator. In part, it is in the third person. A sentence at the bottom of the statement reads as follows:

"I've read the above and had it read to me and it's [an] accurate version of what I told Brent Dillingham on February 29, 1990."

/s/ Deirdre Johnson.

7. The judge stated that there "could have been any number of tactical reasons" why trial counsel did not call Mr. Deadwyler or move for a mistrial. We note, however, that counsel's strategy played out in such a way that the jurors learned that Byrd, who was suspected of dealing in drugs, was carrying a large amount of cash, but that they did not hear an apparently innocent explanation of his possession of it.

8. The judge "hasten[ed] to add," however, that "almost anybody's testimony can be attacked on some ground or other similar to that kind of attack."

Amendment." *Strickland, supra,* 466 U.S. at 687, 104 S.Ct. at 2064. In order to establish prejudice, Byrd must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. "Reasonable probability" does not mean certainty, however, and Byrd need not demonstrate "that it is more likely than not that it was counsel's poor showing that made the difference between conviction and acquittal." *Mack v. United States,* 570 A.2d 777, 784 (D.C.1990). Rather, as Justice O'Connor wrote for the Court in *Strickland,*

> [t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

466 U.S. at 694, 104 S.Ct. at 2068.

### B. The Standard of Review.

■■■ For purposes of appellate review, the trial court's determination whether counsel was ineffective presents a mixed question of law and fact. *Curry v. United States,* 498 A.2d 534, 540 (D.C.1985). We accept the judge's factual findings unless they lack evidentiary support, but we review his legal conclusions *de novo. Id.* For obvious reasons, we tend to be more deferential to those findings by the trial judge which are facilitated by his presence in the courtroom and his ability to observe the players first hand; findings based on documents or other writings merit little deference or none at all. *See In re S.G.,* 581 A.2d 771, 774–75 (D.C.1990); *cf. In re Shillaire,* 597 A.2d 913, 915–16 (D.C.1991).

The trial judge had the opportunity to observe Byrd's attorney in action, a fact which enhances the quality of his appraisal of counsel's performance. The judge also heard the testimony of Investigator Howard and of the other prosecution witnesses, and was able to assess first hand the strength of the government's case.

If the trial judge had also had the opportunity to observe the testimony of Kirk, Rogers and Ms. Johnson, and to assess their demeanor, he would be in a better position than we are to evaluate the prejudice to the defense occasioned by counsel's failure to call them. In this case, however, the trial judge, like this court, had access only to the transcript of the preliminary hearing testimony of the two men and to the written statement of Ms. Johnson. In assessing the potential impact of the testimony which defense counsel failed to present, we have access to the same materials which were available to the trial judge.

### C. The Deficient Performance Prong.

■ We agree with the trial judge that in this case, Byrd met the very substantial burden which *Strickland* places on him with respect to the deficient performance prong. His trial attorney was in a position to call three eyewitnesses who were on the scene at the time of the alleged drop, and who had the opportunity to observe Byrd's activities. These witnesses would have contradicted Investigator Howard's inculpatory testimony. As we show below in greater detail in our discussion of prejudice, counsel's failure to present these defense witnesses also left Byrd with a Hobson's choice of either testifying (and thus effectively disclosing his prior convictions to the jury) or remaining silent and leaving the prosecution case uncontradicted. Two of the witnesses had testified at the preliminary hearing;[9] the third was readily located by successor counsel and evidently available to the trial attorney too.

The failure to make a proper pretrial investigation, to interview exculpatory witnesses, and to present their testimony, constitutes constitutional ineffectiveness. *Sykes v. United States,* 585 A.2d 1335, 1338 (D.C.1991); *Ramsey v. United States,* 569 A.2d 142, 147 (D.C.1990). Although

---

**9.** It does not appear that trial counsel was responsible for securing these witnesses' testimony at the preliminary hearing. Kirk testified that he came to court because Byrd's aunt had told him to come down. He said he first discussed the case with Byrd's attorney "five minutes ago."

the force of the potential defense testimony might perhaps have been weakened in some measure by the admissions of Kirk and Rogers that they may not have been watching Byrd all the time—and even this perceived weakness, as we show below, is less than decisive—the testimony of three independent witnesses that they did not see Byrd drop the drugs would surely have provided substantial benefit to the defense case. The government, albeit a trifle inscrutably, has all but conceded that trial counsel's performance failed to meet applicable professional standards.[10] We now so hold.

*D. The Prejudice Prong.*

We are also satisfied that Byrd was significantly prejudiced by his trial counsel's errors, for his prospects of acquittal were severely impaired. It is instructive to compare the straits in which Byrd found himself at trial with the situation that would have existed if Kirk, Rogers and Ms. Johnson had been in court to testify on his behalf.

With no exculpatory witnesses to present, Byrd's lawyer found himself—and more importantly, his client—between the proverbial rock and hard place. The prosecution would present the testimony of a police officer who said he had seen Byrd drop the bag containing the drugs. The officer's account was corroborated in part by a second officer (who did not, however, witness the drop), by the recovery of the drugs themselves, and by Byrd's hurried departure upon the arrival of the police. Counsel had two options; he could leave the entire prosecution case uncontradicted,

or he could advise Byrd to testify, but be impeached with four convictions, including one for armed robbery and one for drugs.

Each of these alternatives conjures up an image of impending doom. Without Byrd's testimony, there would have been no defense at all. If Byrd testified, as he in fact did, the testimony would be that of an individual with an obvious stake in the outcome. Moreover, Byrd would be (and was) impeached with his prior convictions. In spite of the instruction, which juries are supposed and presumed to obey, that a defendant's prior convictions may be considered solely in assessing credibility, *Thompson, supra,* 546 A.2d at 425, any competent attorney would have been aware of the perils inherent in their disclosure.[11] Empirical studies have shown, and every trial lawyer knows, that these limiting instructions are difficult if not impossible to follow, *id.* at 425,[12] and that juries are apt to convict a defendant who has a bad record because they believe that he is more likely to have committed the crime, or to punish him for being a bad man. *Id.* at 419.

If the three potential defense witnesses had testified, on the other hand, Byrd could have directly challenged the central proposition in the prosecution's case, namely, that Byrd was the man who possessed and dropped the drugs.[13] Moreover, the challenge would not have come from the accused, but from three independent individuals with no direct stake in the result. With three witnesses disputing the account of an officer who acknowledged that he had made numerous drug arrests in the fourteen months between Byrd's apprehension

---

**10.** This near-concession is made in partially nonconcessionary language: "[W]hile not conceding the issue of appellant's trial counsel's ineffectiveness, which we submit was agreed to by the parties not to be at issue, the clear issue involved here is whether or not appellant had been prejudiced." In other words, suggesting that it might never concede, the government conceded.

**11.** "The naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction." *Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790

(1949) (Jackson, J., concurring), quoted in *Thompson, supra,* 546 A.2d at 428.

**12.** "One study suggests that when a defendant's criminal record is known and the prosecution's case has contradictions, the defendant's chances of acquittal are 38% compared with 68% otherwise." *Thompson, supra,* 546 A.2d at 425, citing KALVIN & ZEISEL, THE AMERICAN JURY 160 (1966).

**13.** The proposed testimony by Rogers and Ms. Johnson that police searched for the bag for five or ten minutes might have cast doubt on Investigator Howard's testimony that he saw the drop.

and trial, and whose recollection might therefore be flawed, the risks in not calling Byrd to the witness stand (and thereby avoiding disclosure of convictions) would have been significantly reduced. We think it would have been apparent to any objective observer that, with these witnesses ready to testify, the scales would have tipped quite differently from the way in which they did at the actual trial, and that Byrd's prospects of acquittal would have been appreciably greater.

The government argues that Kirk and Rogers conceded that they were not watching Byrd all the time, and that Byrd could have dropped the drugs while they were looking elsewhere. To be sure, anything is possible. An impartial jury which found the witnesses credible [14] might well have found it difficult to believe, however, that Byrd was carrying a brown paper bag, and dropped it, and that all three of the witnesses [15] who observed his arrival happened to be looking away at the same time, never saw him with the bag, and never observed a drop. Coincidences are the exception, not the norm. We recently held in *Poulnot v. District of Columbia*, 608 A.2d 134, 139 (D.C.1992), that an impartial trier of fact was not required to credit a defense version of events that would have rested upon a remarkable coincidence. "Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Id.* The same reasoning applies with at least equal force when it is the prosecution's version that presupposes such a coincidence.

The government asks us to affirm the finding of no prejudice because Kirk and Rogers "could not say *for certain* that appellant never had, or disposed of, the bag

of drugs during the relevant time period...." (Emphasis added). Certainty, however, is not necessary. Indeed, Byrd was not even required to show that it was more likely than not that he would have been acquitted but for his lawyer's errors. *Mack, supra,* 570 A.2d at 784.[16] A reasonable probability is a probability sufficient to undermine confidence in the result. *Strickland, supra,* 466 U.S. at 690, 104 S.Ct. at 2065–66; *Mack, supra,* 570 A.2d at 783. Our confidence in this result is undermined.

------------

The Supreme Court emphasized in *Strickland* that a conviction is not to be lightly overturned on account of a trial attorney's allegedly defective performance at trial. Generalizations about such cases are ill-advised, for each case turns on its own facts. Nevertheless, we find substantial merit in the following passage in Byrd's brief on appeal:

> [T]o affirm the court's conclusion is tantamount to concluding *as a matter of law* that the constitutional requirement of investigating the defense case and of putting on defense witnesses has no practical importance in the representation of criminal defendants. If the testimony of exculpatory eye-witnesses has no constitutional importance, it is hard to imagine what kind of ... defense evidence has any importance.

(Emphasis in original).

### V

### CONCLUSION

For the foregoing reasons, the judgment in No. 89–CF–159 is affirmed. The judg-

---

**14.** Since the trial judge had no opportunity to observe these witnesses' demeanor, he could not base his finding of no prejudice on any notion that they were not credible. *See Rice v. United States,* 580 A.2d 119, 122–23 (D.C.1990).

**15.** Although neither the government nor the judge appear to have given much weight to Ms. Johnson's statement that Byrd did not drop the drugs, she too was a potential defense witness.

**16.** The government also points out that neither Rogers nor Kirk mentioned the presence in the

area of an ice cream truck, and argues that "their testimony would have likely [sic] contradicted that of the appellant regarding the presence of the ice cream truck." (Govt. brief, at 19–20). Since neither witness was asked about the ice cream truck, the government's argument is entirely speculative. Moreover, defense counsel also failed to interview or call Ms. Johnson, whose statement explicitly corroborated Byrd's testimony in regard to this truck.

ment in No. 90–CO–772 is reversed, and the case is remanded for a new trial.

*So ordered.*

KERN, Senior Judge, dissenting:

The majority overturns a verdict of guilty the jury rendered upon the authority of the Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* permits courts to reverse convictions after trial when the defendant shows that defense counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064. However, the Supreme Court admonished:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction ... and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

*Id.* at 689, 104 S.Ct. at 2065. Accordingly, the Supreme Court has placed upon the defendant the burden of overcoming the strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2065–66.

In the instant case, the majority concludes that the defense attorney was the functional equivalent of no attorney at all because he called the defendant and two of his friends as witnesses at the preliminary hearing and then called *only* the defendant as a witness in his subsequent trial. However, neither defense counsel nor the defendant appeared at the post-trial hearing on appellant's ineffectiveness claim. Rather, he baldly asserted by different counsel that the defense he had presented at trial through his own testimony without the tes-

timony of his two friends was constitutionally defective. In support of his assertion he pointed only to the transcript of their testimony at the preliminary hearing. This assertion ignores the facts (1) that the defense attorney observed his two friends give their respective testimony prior to trial and thus was in a far better position than either the trial court or the majority to evaluate their effectiveness with the jury as witnesses, (2) that their testimony at the preliminary hearing was successfully shaken by the prosecutor's cross-examination and, (3) that their testimony was to some extent at odds with the testimony presented by the defendant himself at trial as to what happened on the night of the arrest. Thus, appellant simply did not carry the burden placed upon him.[1]

The majority by its decision in effect adopts a new *per se* rule: whenever and without regard to the circumstances, a defense attorney does not present an eyewitness as a witness at trial, he has thereby rendered constitutionally defective assistance of counsel. The Supreme Court in *Strickland* never intended that reviewing courts adopt such an extreme rule and so I respectfully dissent.

---

1. The majority, in footnote asides, suggests that the defense attorney's performance was so ineffective as to constitute the functional equivalent of no attorney at all. The conscientious trial judge who presided over the trial did not so conclude and he obviously had more sense of the actual trial than does the majority upon the cold record.