Fred L. **FREDERICK**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 93–CF–621, 97–CO–228, 97–CO–1834.

District of Columbia Court of Appeals.

Argued Oct. 7, 1999.
Decided Dec. 9, 1999.

Carl V. Angelis, Washington, DC, appointed by the court, for appellant.

Asunción Cummings Hostin, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Elizabeth Trosman, and Thomas R. Eldridge, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, RUIZ, and REID, Associate Judges.

SCHWELB, Associate Judge:

Fred L. Frederick was convicted by a jury of first degree murder while armed (FDMWA), D.C.Code §§ 22–2401, –3202 (1996), and carrying a pistol without a license (CPWOL), D.C.Code § 22–3204(a). Frederick subsequently filed a motion pursuant to D.C.Code § 23–110 to vacate his conviction, alleging that his representation at trial by his attorney was constitutionally inadequate. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Following an evidentiary hearing, the trial judge, Honorable José M. López,[1] denied Frederick's motion in an exhaustive thirty-six-page written order.

In these consolidated appeals from his convictions and from the denial of post-trial relief, Frederick asserts that trial counsel made a substantial number of serious errors and omissions in the preparation and presentation of Frederick's defense, and that the result of the trial was

thereby rendered unreliable. We find it necessary to address in detail only one of Frederick's contentions, namely, that his counsel was constitutionally ineffective in that he failed inexcusably to take the necessary steps to secure the testimony of Eric Winters, an eyewitness to the murder who had testified unequivocally at a prior proceeding that Frederick was not involved in the crime.[2] We conclude as a matter of law that, with respect to this specific issue, Frederick has demonstrated both "defective performance" and "prejudice" as required by *Strickland.* Accordingly, we reverse.

## I.

### THE PROCEEDINGS IN THE TRIAL COURT

A. *Factual background.*[3]

These appeals arise out of a murder which occurred more than a decade ago. On March 3, 1989, Lonnie Hart was found dead of gunshot wounds on a street in northwest Washington, D.C. His body was riddled with bullets. At the time of his death, Hart was seventeen years old.

The police investigated the homicide and discovered two alleged eyewitnesses, Eric Winters and Ken Richards. Winters was sixteen years of age at the time of the murder, while Richards was a year older. Winters and Richards implicated Michael Smith in Hart's death. A warrant for

---

1. Three different judges have presided over proceedings relevant to these appeals. The trial of Frederick's former codefendant, Michael Smith, was before Judge Henry F. Greene. Judge Shellie F. Bowers presided over Frederick's first trial, which resulted in a mistrial. See pp. 430–32, *infra.* Judge López was the presiding judge at Frederick's second trial and at the hearing on Frederick's post-trial motion.

2. Eric Winters is not the real name of this witness. Because, as this opinion reveals, the witness was involved in the juvenile justice system, we are using a fictitious name to protect his identity. For similar reasons, the

names Ken Richards and Sam Perkins, which appear later in the text, are likewise fictitious.

3. The appellate record in this case is voluminous. It includes, *inter alia,* the transcripts of three trials—one of Smith, two of Frederick—and of the hearing on Frederick's post-trial motion. In this opinion, we confine our discussion of the facts and of the prior proceedings to those matters that we deem relevant to the single issue that we find it necessary to decide, namely, whether Frederick's attorney was constitutionally ineffective in failing to secure and present the testimony of Eric Winters.

Smith's arrest was issued on March 25, 1989, and Smith was taken into custody two weeks later. Smith told the police that Frederick was the principal in the murder, and Frederick was arrested on July 27, 1989 pursuant to a warrant.

On December 20, 1989, almost nine months after Smith's arrest, a grand jury returned an indictment charging both Smith and Frederick with FDMWA and Frederick with CPWOL. Frederick filed a motion for severance of defendants, and on June 25, 1990, the cases against Smith and Frederick were severed. Because Smith's testimony would be needed for a successful prosecution of Frederick, the government brought Smith to trial first.

### B. *The trial of Michael Smith.*

Smith's trial began on July 5, 1990. The government relied primarily on a somewhat inculpatory statement which Smith had provided to the police and on the testimony of Eric Winters and Ken Richards. Winters and Richards both testified that they knew Michael Smith, Fred Frederick, and Lonnie Hart. Each of them claimed to have had an unobstructed view of Hart's murder. Both Winters and Richards identified Smith as one of two men involved in the killing. Eric Winters testified that Fred Frederick, whom he knew well, and whom he saw "about three times a week . . . going over [to] his girl friend['s] house," was not the second man involved in the murder:

> Q Now, was the man who got out of the back seat of that car and walked around and shot Lonnie, according to what you saw, Fred Frederick?
>
> A No.
>
> Q Are you positive of that?
>
> A Yes.

\* \* \* \* \* \*

Q You tell us you're sure that the man you saw choke Lonnie was Mike, correct?

A Yes.

Q Now, you also tell us that you're sure that the man who shot Lonnie was not Fred?

A It wasn't Fred, because I know how Fred look[s].

Q Are you just as sure of both of those things?

A Yes.[4]

Events prior to and during Smith's trial persuaded the police, the prosecutor, the judge, and the jury that Winters was a credible and impressive witness. Detective Herman Johnson of the Metropolitan Police Department, who investigated Hart's murder, testified that he had credited Winters and Richards whenever there had been a conflict between either man's account and the account given by Smith. During argument before the court, the prosecutor referred favorably to "the demeanor and the forthrightness and certitude of this witness [Winters] on the witness stand." Judge Greene also had occasion to comment on Winters' credibility:

> [T]hat kind of common sense was evident throughout Mr. [Winters]' testimony . . . . I don't find the reliability of his observations at all suspect in this case. And, indeed, if I were the fact-finder, I would give him substantial credence.

Finally, the jurors evidently believed Winters' testimony, for they found Smith guilty of second degree murder while armed.

### C. *Frederick's first trial.*

Frederick's first trial, with Judge Shellie F. Bowers presiding, began on February 26, 1992, more than two and one half years after Frederick's arrest. The principal witnesses against Frederick were Michael

---

**4.** Richards testified at trial that Frederick was one of the two perpetrators. He acknowledged, however, that in his interview with the police eleven days after the murder, he had

been able to identify only Michael Smith and not Fred Frederick. Richards' description of the second man was also inconsistent with Frederick's appearance.

Smith, Sam Perkins, and Smith's girl-friend, Katrina Terrell.

Smith, who had entered into a "cooperation agreement" with the government to testify truthfully in exchange for a recommendation that his sentence be reduced by half, told the jury that Frederick was determined to kill Hart because Hart had beaten up and taken $1,000 worth of drugs from Perkins, a fourteen-year-old boy who allegedly worked for Frederick's drug selling operation. According to Smith, someone had told Frederick on the night of the murder that Hart could be found near University Place in northwest Washington. Frederick stated that he intended to kill Hart, and he told Smith to drive to University Place and to stop in an adjoining alley. When he spotted Hart, Frederick, who was armed with a pistol, left the car in pursuit of his intended victim. Smith testified that he then heard three shots. Although, according to Smith, Frederick was out of Smith's view by the time the shots were fired, the import of Smith's testimony was that Frederick must have killed Lonnie Hart.[5]

Katrina Terrell told the jury that after Smith had been arrested, Frederick paid her a visit. According to Ms. Terrell, Frederick reassured her that she had nothing to worry about. Frederick informed Ms. Terrell that he (Frederick), and not Michael Smith, had shot Lonnie Hart. Frederick further told Ms. Terrell, according to her account, that he had subsequently disposed of the pistol with which the decedent was shot, and that the police therefore would not be able to find the murder weapon.

Frederick did not testify at his first trial. His defense counsel sought leave in mid-trial to introduce the testimony that Eric Winters had given at Smith's trial. Counsel contended that he had made diligent efforts, through his investigator, to locate Winters, and that Winters could not be found. The prosecutor opposed the defense request, arguing that the government had had no occasion or opportunity to cross-examine Winters when he testified at Smith's trial and exculpated Frederick.[6] The prosecutor also contended that defense counsel had not made diligent efforts to secure Winters' presence in court.

There was extensive discussion between court and counsel during the trial regarding the defense claim that Winters was unavailable to testify. Judge Bowers was extremely critical of defense counsel's lack of diligence in that regard, beginning with counsel's failure to attend or monitor Michael Smith's trial. The judge noted that Winters had been involved in the juvenile justice system and had later become a criminal defendant as an adult, that defense counsel had failed to keep abreast of the status of Winters' cases, and that counsel had made virtually no effort before the eve of trial to locate Winters, even though Winters was a key defense witness, and even though Frederick was charged with first-degree murder.[7] The judge ruled

---

5. Smith's testimony about his own role in Hart's murder differed sharply from the accounts given by Winters and Richards at Smith's trial. According to both Winters and Richards, Smith approached and grabbed Hart immediately before Hart was shot. In fact, Winters appeared to claim at a pretrial motions hearing that it was Smith who shot Hart. Smith testified, on the other hand, that he was in the car when Hart was killed by Frederick.

6. The prosecutor also claimed that, since Smith's trial, the government had discovered that Winters had been lying when he stated that Frederick was not a participant in the murder. The government's position was based on letters allegedly written by Frederick to Smith while the two men were incarcerated. The government had not, however, obtained proof that Frederick was the author of these letters. The letters were not received in evidence, and they are not a part of the record on appeal.

7. In finding a lack of diligence on the trial counsel's part, the judge stated, *inter alia:*

All I'm saying to you in terms of diligence, if you know somebody is locked up, you just don't wait until trial date and say give me a come-up.

that the defense had failed to demonstrate Winters' unavailability, and he therefore declined to permit the introduction of Winters' prior testimony. Judge Bowers did recess the trial until the next day to enable counsel to make a further attempt to produce Winters, and the judge also instructed Winters' juvenile aftercare worker to attempt to locate him. When Winters had not been found by the following day, however, the trial continued, the attorneys presented their closing arguments, and the judge instructed the jury.

After jury deliberations had commenced, Winters' aftercare worker contacted the judge and advised him that Winters had been located. The judge's initial reaction was that this development had come too late. Recognizing the potential importance of Winters' testimony, however,

> The man may have been doing a 30 day sentence, that's one thing, or he may have been doing a ten year sentence, that's something else, and then you know he's going to be there, but to have no idea how long he's going to be locked up and just on the day of trial say Your Honor, give me a come up and then you find out then he is no longer in jail, that's a lack of diligence.
>
> If you knew the man was locked up, you should have found out how much time he had so that you would know before he got out you could talk to him, go down there and talk to him at wherever he is locked up.
>
> You certainly had access to him then. You could have found out where he was locked up, when to talk to him, found out where he was going to live, where he's going to stay when he gets out, are you going to stay with your grandmother, girlfriend. Give me some places where I can locate you, but you did none of that.
>
> \* \* \* \* \* \*
>
> Both sides announced ready to me and then we started this trial and in the middle of the trial, now you ask me to let you use the transcript of [Eric Winters] because he's unavailable. The government says we want him here to cross-examine.
>
> So, then we have this hearing about what other efforts were made and we find out that the next effort after that one date in November was February 25th.
>
> \* \* \* \* \* \*
>
> The bottom line is your efforts are coming too tardy to be diligent. Therefore, we'll not permit you to use the transcript.

Judge Bowers called in the attorneys. Following a discussion between court and counsel regarding how the case should proceed, the judge invited the defense to make a motion for a mistrial.[8] Frederick's attorney orally requested a mistrial and, over the prosecutor's emphatic opposition,[9] the judge granted the motion.[10]

### D. *Frederick's second trial.*

Frederick's second trial began on March 3, 1993, the fourth anniversary of Lonnie Hart's death, and more than a year after the beginning of Frederick's first trial. The prosecution again relied primarily on the testimony of Michael Smith, Katrina Terrell, and Sam Perkins. The government's basic theory of the case remained unchanged.

8. Meanwhile, the jurors had sent a note to the judge in which they disclosed that they had been unable to reach a unanimous verdict and requested further instructions. The judge did not open or read the note until after he had already declared a mistrial.

9. The prosecutor argued that a mistrial was not called for. He claimed that in light of the judge's finding that Frederick's trial attorney had not been diligent, the proper procedure in the event of a guilty verdict would be for Frederick to file a post-trial motion pursuant to § 23–110, alleging ineffective assistance of counsel.

10. The judge stated that he had "not [been] inclined to reopen [the case] after the jury has started to deliberate because that just highlights his testimony out of all proportion." Cf. *Davis v. United States*, 735 A.2d 467, 473 (D.C.1999) (holding, under remarkably similar circumstances, that "[t]he highlighting of the new evidence, at the expense of the old, would have been more or less inevitable so late in the proceedings, and the reopening of the record would have had a particularly disruptive effect on the orderly flow of the trial") (citation and internal quotation marks omitted).

At the second trial, as at the first, defense counsel was unable to produce Eric Winters as a witness. In a remarkable reprise of the proceedings before Judge Bowers a year earlier, counsel asked the court, five days into the trial, to admit the testimony that Winters had given at Michael Smith's trial almost three years earlier. The prosecutor objected, insisting, as he had before Judge Bowers, that Winters had been lying when he exculpated Frederick, and that in any event, the government had the right to cross-examine Winters and would be deprived of that right if Winters' prior testimony were admitted. The prosecutor also challenged the sufficiency of defense counsel's attempts to subpoena Eric Winters for the second trial:

> If diligent efforts had been used that witness could have been found. As a matter of fact, members of the Metropolitan Police Department ran into him over the weekend when they were looking for Mr. [Sam Perkins].... Apparently this witness wasn't trying to avoid the police when they were out looking for [Sam Perkins].... This young man is not unavailable. As I indicated to the court today, when the police were out looking for [Sam Perkins] they happened to run into this particular individual that night, and spoke with him briefly. He didn't run from the police. We submit to the court he cannot be declared unavailable.

In Yogi Berra's immortal phrase, it was like "déjà vu all over again."

Judge López expressed reservations as to whether Winters was really unavailable,[11] but he made no specific finding regarding the adequacy of counsel's efforts to locate Winters. The judge ruled, instead, that Winters' prior testimony should not be admitted because, when Winters gave evidence at Smith's trial, the government had not had the opportunity to cross-examine him with respect to Frederick's role or lack thereof in the murder of Lonnie Hart.

With his exculpatory witness once again unavailable, Frederick elected on this occasion to testify in his own defense. Frederick denied any knowledge of the crime and professed to be generally unfamiliar with most of the actors in the drama. Frederick claimed that he had never seen Hart, the man he was accused of shooting. Frederick stated that he was aware that Smith was a clerk in a store in his neighborhood, but he denied knowing Smith "personally." Frederick asserted that he had never spoken to Ms. Terrell "directly," and that although he had seen Sam Perkins hanging around with Smith, he was not otherwise acquainted with Perkins. Frederick acknowledged during his testimony that he had been convicted of possession of cocaine with intent to distribute it and also of possession of marijuana with intent to distribute that substance. Frederick also gave somewhat contradictory and arguably unpersuasive testimony regarding his employment and other matters.

The jury convicted Frederick of both counts of the indictment. He was sentenced to concurrent terms of imprisonment of twenty years to life for FDMWA and one year for CPWOL. He filed a timely notice of appeal.[12]

### E. *The post-trial motion to vacate Frederick's conviction.*

On September 16, 1994, approximately eighteen months after his second trial, Frederick, who by then was represented by his present appellate counsel, filed a motion pursuant to D.C.Code § 23–110 to

---

**11.** The judge stated: "Even though there are indications that Mr. [Winters] is unavailable, I'd like to add that the magnitude of the unavailability is a very difficult one. Apparently he's still in the community. He is slipping around, the government has seen him, and I guess you might say he is unavailable. It's just very difficult."

**12.** Frederick's direct appeal is No. 93–CF–621.

set aside his conviction. In his motion, Frederick alleged that his trial counsel had been constitutionally ineffective. One of Frederick's principal claims of ineffectiveness related to trial counsel's failure to produce Eric Winters as a defense witness.

On March 22, 1996, Judge López held an evidentiary hearing on Frederick's motion. The only witness called by the government was Frederick's attorney at the trial. On direct examination, trial counsel described as follows his efforts to find Winters and to subpoena him to testify on Frederick's behalf at the second trial:

> My recollection is that for the second trial, I had my investigator go out, talk with his mother at her home, at her job, attempt to find from her where he was staying.

> It's my recollection that we were told that he was not staying at the home or at least I was told by my investigator he was not staying at the home.

> We reviewed the social file of the Court to make sure he wasn't in jail or in some juvenile facility. I had my investigator check the records in Maryland as well as the District of Columbia to make sure that he wasn't in jail. I had my investigator go look in this area for this gang or whatever it was, where the 640 crew hung out. He was instructed to do that. He came back to me and told me that he had done all that.

> \* \* \* \* \* \*

> It was from my understanding and from my recollection of the discussions that I had with [my investigator] he went to the mother's home and we knew she lived—we knew she worked at a restaurant.

> I don't know if she was still working at the restaurant when he was out checking for her, but he told me he went out to her home and talked with her regarding where Mr. [Winters] was, where he lived, and he was not successful in getting any information from her regarding ... Mr. [Winters].

Trial counsel also testified that he had discussed Winters' unavailability with Frederick, and that the defendant had stated his desire to go ahead with the trial, expressing confidence that he would "win."

On cross-examination by Frederick's new attorney, counsel testified that he could not recall whether Judge Bowers had criticized him at the first trial for not monitoring in timely fashion "where Mr. [Winters] was in the juvenile system." He stated that he did not recall Winters' age, or whether Winters had given his age at Smith's trial, or whether Winters was an adult by the time of Frederick's second trial.[13] He likewise did not remember whether he had asked his investigator to determine if Winters was facing any adult charges. The cross-examination continued:

Q .... [W]ere you aware that [Eric Winters] was in this courthouse on November 18th, 1992 for presentment in a felony case?

A No, I was not aware of that.

Q Were you aware that he was in this courthouse in December of 1992 for arraignment on that felony case?

A No, I wasn't aware of that.

Q Were you aware that he was in this courthouse on January 26th, 1993 for a status hearing in that felony case?

A No, I wasn't aware of it.

Q Would it be safe to say that in your experience as an attorney, that if you or your investigator had done a check in the criminal information office in a time from November 18th 1992 on, you would have learned that

13. In fact, Winters testified at Smith's trial that he was born on June 19, 1973. By the time Frederick was tried for the second time, Winters' age was nineteen years and nine months. Winters was therefore subject to prosecution as an adult rather than as a juvenile.

there was a pending case against Mr. [Winters]?

A I can't answer—I mean I cannot tell you what would have happened—I don't know about these things, so I can't tell you that that's the case.[14]

Frederick's attorney also interrogated trial counsel with respect to the voucher counsel had filed pursuant to the Criminal Justice Act in order to obtain payment for his representation of Frederick. The only entries on the voucher between Frederick's first and second trials which were even potentially relevant to trial counsel's alleged efforts to locate Winters were a visit to the crime scene on April 11, 1992 and a twenty-two-minute telephone conversation with his investigator on August 2, 1992.[15]

### F. *The order denying Frederick's post-trial motion.*

On January 23, 1997, the trial judge issued a thirty-six page Memorandum and Order denying Frederick's § 23–110 motion. With respect to trial counsel's endeavor to secure Winters' testimony at the trial, the judge found as follows:

[Trial counsel] described his efforts to locate witness [Eric Winters] for the defendant's second trial. According to [counsel], his investigator (1) had contacted the school [Winters] had attended at the time,[16] (2) spoken to [Winters]' mother, (3) searched the area where [Winters] was living, (4) examined the social worker file, (5) looked at his previous juvenile file, (6) looked for the social worker file in the courthouse, (7) traced every lead in the area of Georgia and Morton Streets, the location of the "640 Crew" of which [Winters] was alleged to be a member, and (8) checked the jail records for the District of Columbia and Maryland.[17]

The judge made no reference in his findings to trial counsel's acknowledgment, on cross-examination, that counsel was totally unaware of Winters' several appearances in the Superior Court in the months preceding Frederick's second trial. The judge likewise made no mention of the Criminal Justice Act voucher, which reflected that Frederick's attorney personally did little or nothing before the trial to attempt to locate and subpoena Winters.

The judge addressed the issue further in his Conclusions of Law:

Defendant claims that counsel was deficient for failing to call witness [Eric Winters] on the defendant's behalf. The first obstacle to this claim is the testimony of [Frederick's trial] attorney, which this Court credits, that it was the defendant's decision to announce "ready" for trial even though he was fully aware that [Eric Winters] had not been located and that there was *no reason to believe* he would be located for trial. *See* ¶¶ 24, 25, *supra.* The Court finds, based on this testimony, that the defendant cannot show that he suffered any *Strickland* prejudice from [trial counsel's] ac-

---

14. The relevant Superior Court jacket establishes that Winters was in fact in court on that case on the dates indicated by counsel in the portion of the transcript quoted above.

15. At the motions hearing, Frederick's new counsel presented the testimony of Winters' mother and of counsel's investigator in an attempt to show that little, if any, effort had been made by Frederick's trial attorney and his investigator to secure information from Mrs. Winters regarding her son's whereabouts. The trial judge subsequently found, however, that this testimony did not persuade him to disbelieve trial counsel's description of his activities.

16. As previously noted, Winters was nearing his twentieth birthday by the time of the second trial, and there is no evidence that he was then attending school.

17. This enumeration of trial counsel's efforts does not specify when, during the one-year period between the trials, this activity took place. Judge Bowers' criticism of counsel at the first trial focused on the fact that Frederick's attorney had deferred most of what little he did to find Winters until the eve of trial or even later.

tions because defendant Frederick made the decision to go to trial without [Eric Winters]' testimony, and there is no evidence to suggest that he made that decision other than knowingly and voluntarily. Moreover, the Court has discussed, *see supra* at ¶ 31, [defense counsel's] efforts to locate witness [Eric Winters]. Those efforts to locate [Winters], albeit unsuccessful, satisfy this Court that [Frederick's] attorney ... was "functioning as the 'counsel' guaranteed defendant by the Sixth Amendment." *Strickland, supra,* 466 U.S. at 687[, 104 S.Ct. 2052]. One may argue that counsel could have done more to locate [Eric Winters]. But "the proper standard for attorney performance is that of reasonably effective assistance," that is, whether counsel's performance "fell below an objective standard of reasonableness." *Id.* at 687–88[, 104 S.Ct. 2052]. The Court finds that [trial counsel's] conduct was not deficient within this meaning. Further concluding that "the defendant has failed to show prejudice from counsel's alleged unprofessional actions, taken either individually or collectively," the judge denied Frederick's motion. Frederick filed a timely appeal,[18] and the two appeals were consolidated.

## II.

### LEGAL ANALYSIS

A. *The standard of review.*

 "For purposes of appellate review, the trial court's determination whether counsel was ineffective presents a mixed question of law and fact." *Byrd v. United States,* 614 A.2d 25, 30 (D.C.1992) (citing *Curry v. United States,* 498 A.2d 534, 540 (D.C.1985)). We must accept the judge's factual findings unless they lack evidentiary support in the record. *See* D.C.Code § 17–305 (1996); Super. Ct. Civ. R. 52(a). The judge observed Frederick's trial attorney testify, while we did not, and we are in

no position to challenge the judge's decision to credit counsel's testimony.

 In the present case, however, the judge's findings of fact and conclusions of law regarding the issue before us—indeed, almost all of the findings and conclusions in the judge's comprehensive order—are taken virtually verbatim from the proposed findings and conclusions submitted by the prosecutor after the motions hearing. These findings and conclusions are not based on any oral ruling made by the judge. We have recognized that the crowded calendars of busy urban courts "lead[ ] hard pressed judges to turn to counsel for help [in drafting their findings]." *Sacks v. Rothberg,* 569 A.2d 150, 154 (D.C.1990) (citation omitted). But as we explained in *Sacks,* although

> [w]e are mindful of the exceptional caseload under which the trial judges labor, we take this occasion only to remind them of the difficulty which verbatim adoption of proposed findings creates for our statutory obligation to defer to factual findings of the trial court.

*Id.* In a case such as this one, with so much at stake, a trial court's adoption, without alteration, of the government's submission necessitates "more careful review by the appellate court." *Id.; accord, Chase v. District of Columbia Alcoholic Beverage Control Bd.,* 669 A.2d 1264, 1266 n. 2 (D.C.1995) (citation omitted) (where agency's findings of fact and conclusions of law were taken almost verbatim from proposed findings submitted by counsel, "we are inclined to accord somewhat less deference to the Board's decision than we ordinarily would"); *see also Berger v. Iron Workers Reinforced Rodmen Local 201, et al.,* 269 U.S.App. D.C. 67, 76, 843 F.2d 1395, 1404 (1988). This is particularly true where, as here, the judge did not explicitly address the important admissions exacted from trial counsel by Frederick's present attorney on cross-examination.[19]

---

18. This appeal is No. 97–CO–228.

19. Lest our citation of *Sacks* and similar authorities be misunderstood, we note that there

██ The judge's legal conclusions are, of course, reviewed *de novo. See Byrd, supra,* 614 A.2d at 30. Moreover, the mixed question of law and fact here presented, *id.,* implicates a basic constitutional liberty, namely, the right of a criminal defendant to the effective assistance of counsel, and our standard-of-review calculus must take into account this important reality. *Cf. Ker v. California,* 374 U.S. 23, 33–34, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Griffin v. United States,* 618 A.2d 114, 118 (D.C.1992) (discussing appropriateness of more searching appellate review where basic liberties are at issue).

### B. *The Strickland standard.*

██ Under the Supreme Court's seminal decision in *Strickland,* a defendant seeking to overturn his conviction on the basis of ineffective assistance of trial counsel must demonstrate both that counsel's performance was deficient and that the defendant suffered prejudice. Turning first to the deficient performance prong, our appraisal after the fact of counsel's actions is deferential, and we will not readily second-guess a trial attorney's tactical decisions. *See Byrd, supra,* 614 A.2d at 29. Rather, as Judge López correctly pointed out in his order, Frederick must show that his attorney "made errors so serious that [he] was not functioning as the 'counsel' guaranteed [him] by the Sixth Amendment." *Strickland, supra,* 466 U.S. at 687, 104 S.Ct. 2052. To satisfy *Strickland's* prejudice prong, Frederick must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

██ In the present case, in conformity with the applicable standard of review, we accept the trial judge's resolution of all contested issues of fact. Nevertheless, in light of the undisputed evidentiary facts and trial counsel's own testimony, we conclude as a matter of law that defense counsel's performance in attempting to locate Winters was constitutionally deficient and that counsel's failure to produce Winters as a defense witness prejudiced Frederick within the meaning of *Strickland.*

### (1) *Deficient performance.*

We begin our analysis with some obvious and undisputed facts. Frederick was charged, *inter alia,* with first degree murder while armed. If convicted, he faced the prospect of spending much, if not all, of the remainder of his life in prison. The stakes were therefore exceptionally high. A murder trial is serious business, and a lawyer who defends a murder case assumes an awesome responsibility. The quality of representation required of counsel must surely reflect the nature of the task at hand and the potential consequences to the client of an inadequate defense.

The individual whose proposed testimony was at issue—Eric Winters—was an eyewitness to the murder of which Frederick had been accused. The attorneys for the government knew that he was an eyewitness, accepted him as such, and presented his testimony to the jury at the trial of Michael Smith. There, Winters had unequivocally testified, under oath, and under the sponsorship of the prosecutors, that Fred Frederick was *not* involved in the killing of Lonnie Hart. Moreover, the detective conducting the investigation, the prosecutors, the judge and the jury had all evidently been impressed by Winters' testimony and had found him to be a believable young man. Not every defendant charged with armed murder has the opportunity to call such a witness. To a conscientious defense attorney, the pros-

---

was no claim by the defense that the judge was unfair to Frederick or biased in favor of the prosecution. Indeed, to the prosecutor's discernible consternation, the judge made several significant rulings in favor of the de-

fense. In particular, the judge refused to admit the letters allegedly written by Frederick to Smith or to order Frederick, during trial, to provide the government with a handwriting sample.

pect of going to trial without Winters—indeed, without even having interviewed Winters—should surely have appeared unthinkable.

Moreover, by the time Frederick's attorney was supposed to be preparing for his client's second trial, he had already been firmly rebuked by Judge Bowers for his failure to monitor Winters' activities, and to search for Winters, in a timely and effective manner. The judge had also admonished counsel for waiting until the middle of the trial to raise the issue of Winters' alleged unavailability. Judge Bowers had finally declared a mistrial after the jury had already commenced its deliberations. The judge had obviously done so because he quite reasonably apprehended that, without Winters' testimony, Frederick could not receive a fair trial.

A mistrial, like the reversal of a conviction,

> entails substantial social costs; it forces jurors, witnesses, courts, the prosecution and the defendant[ ] to expend further time, energy, and other resources to repeat a trial that has already once taken place. . . . The passage of time, erosion of memory, and dispersion of witnesses may render retrial difficult, even impossible.

*United States v. Mechanik,* 475 U.S. 66, 72, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (citation omitted). The decision of an experienced trial judge to declare a mistrial, notwithstanding these obvious social costs, should surely have conveyed to Frederick's attorney the critical importance of keeping track of Winters' whereabouts and of ensuring Winters' availability to testify at Frederick's second trial. As it turned out, counsel had almost a year between Frederick's two trials in which to search for, find, interview and subpoena Winters. Nevertheless, the unfortunate history that had precipitated Judge Bowers' displeasure repeated itself.

The evidence at the hearing on Frederick's § 23–110 motion revealed that Frederick's attorney personally had done almost nothing between Frederick's two trials to monitor the activities of his critically important defense witness. Moreover, counsel and his investigator had failed to consult the most obvious source of information for a young man long involved in the criminal justice system, namely, the records of the Superior Court. The lack of any effective effort on the part of trial counsel to locate Winters, either personally or through meaningful supervision of his investigator, is also reflected by counsel's Criminal Justice Act voucher. The only even arguably relevant entries on the voucher during the critical months preceding the second trial related to a visit to the crime scene and a single conference with counsel's investigator. By his own admission, trial counsel did not know that Winters had appeared in a case pending against him in Superior Court on several occasions in late 1992 and early 1993. Counsel's failure to monitor Winters' status was especially astonishing in light of the fact that Judge Bowers had upbraided him on that very ground during Frederick's first trial.

Frederick's attorney testified, and the judge found, that the decision by the defense to proceed to trial without Winters was made by Frederick personally. Assuming, without deciding, that such a determination—one that obviously requires a professional evaluation of the strength of the evidence—may properly be left by counsel to a lay client who has had no legal training, we are satisfied that, on this record, the fact that Frederick apparently decided to go ahead without his star witness is irrelevant to the proper disposition of the question before us, namely, whether trial counsel's representation of Frederick was constitutionally ineffective. This is so because the evidence compels the inescapable conclusion that counsel's deficient performance in failing to take the necessary steps to make Winters available to testify created the Hobson's choice facing Frederick. With his counsel having been unable

to ascertain Winters' whereabouts, one alternative available to Frederick was to keep the trial date and proceed to trial, but this would have to be done without Winters' testimony. The defendant's other option was to give up the trial date and remain in pretrial incarceration—a status which had already lasted well over three and one half years—in the hope that Winters, whom counsel had failed to locate in the years that had passed since Frederick's arrest, would nevertheless soon become available to testify.[20] Both of these alternatives were obviously quite unsatisfactory from the perspective of a long-incarcerated defendant who wished to exercise his right to go to trial. If Frederick's attorney had kept himself abreast of the progress of Winters' criminal case, Winters would in all probability have been available, and Frederick would not have found it necessary to agree to proceed without the man who appeared to be his best (if not his only) important witness.

■ "The failure to make a proper pretrial investigation, to interview exculpatory witnesses,[21] and to present their testimony, constitutes constitutional ineffectiveness." *Byrd, supra,* 614 A.2d at 30 (citation omitted). Assuming that defense counsel did everything that he claimed to have done to find Winters, and that counsel did not mistakenly attribute to the second trial efforts his investigator made for the first, (*e.g.,* inquiring at Winters' school), we are nevertheless satisfied, as a matter of law, that Frederick has met his burden under *Strickland* of establishing deficient performance.[22]

*(2) Prejudice.*

■ In order to satisfy *Strickland's* prejudice prong, Frederick was required to demonstrate a reasonable probability that, but for his attorney's errors, the result of the trial would have been different. Frederick need not show, however, that if Winters had testified, Frederick would necessarily have been acquitted. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052.

In this case, Winters' testimony that Frederick was not involved in Lonnie Hart's murder was obviously material. At least at the time of Smith's trial, all those who heard Winters' account—police, prosecutors, judge and jury—evidently credited it. Under these circumstances, we conclude as a matter of law that Frederick has made a sufficient showing of prejudice. Judge Bowers obviously so concluded when he declared a mistrial solely because Winters had not been available to testify. Given the importance of the potentially credible exculpatory testimony that trial counsel did not present, we cannot agree with the conclusion of the trial judge at the second trial that Frederick failed to show prejudice in the *Strickland* sense.

In *Byrd, supra,* a "drop-see" drug prosecution, we were confronted with an issue similar to the one presented here. The appellant's counsel had failed to call, at trial, witnesses who had testified at an earlier hearing that the defendant did not possess or drop the drugs. We reversed Byrd's conviction for ineffective assistance of counsel, and remarked that "[i]f the

---

**20.** It appears that Frederick was quite understandably pressing his attorney to get the case tried as soon as possible.

**21.** There is nothing in the record to suggest that at any time during his representation of Frederick, Frederick's trial attorney ever interviewed Winters.

**22.** The government also argues that the determination whether to call a witness is a "tactical decision" by counsel to which the court should accord deference. In this case, however, Frederick's attorney did not make a "tactical" decision not to present Winters' testimony. On the contrary, counsel and his investigator were simply unable to find or interview him.

testimony of exculpatory eyewitnesses has no constitutional importance, it is hard to imagine what kind of defense evidence has any importance." 614 A.2d at 32 (ellipsis omitted) (quoting the appellant's brief).[23] Here, in light of the favorable reviews that Winters' evidence received at Smith's trial, our reasoning in *Byrd* applies *a fortiori*.

Winters did not testify at the § 23–110 hearing, and the government claims that Frederick's failure to present Winters as a witness, or to file an affidavit from Winters, defeats Frederick's claim of prejudice. The government relies on cases such as *Sykes v.. United States,* 585 A.2d 1335 (D.C.1991). In *Sykes,* the defendant filed a post-trial motion to vacate his conviction for distribution of heroin. He claimed that his trial counsel was ineffective in failing to call one Audrey Smith as a defense witness at trial. Sykes asserted that if Ms. Smith had testified, she would have exculpated Sykes, and would have revealed that it was she, and not Sykes, who actually sold heroin to an undercover officer. Sykes did not, however, support his motion with an affidavit from Ms. Smith. We sustained the trial judge's holding that the defendant had failed to demonstrate prejudice, reasoning that Ms. Smith would have had to incriminate herself in order to assist Sykes, and that "[i]f Ms. Smith had been willing to provide exculpatory evidence, as Sykes implies, then Sykes' present attorney would surely have secured an affidavit from her." *Id.* at 1338; *accord, McAdoo v.*

*United States,* 515 A.2d 412, 422–23 (D.C. 1986).

This case, however, is unlike *Sykes* and *McAdoo.* Here, Frederick proffered testimony that had been given by Winters at Smith's trial. Winters had sworn on that occasion that Smith was guilty but that Frederick was innocent. It is true that by the time of the § 23–110 motions hearing, more than five years had passed since Winters had given his evidence. We are aware of no basis in authority or in reason, however, for placing on the defendant the burden of proving that the witness had not changed his account during the intervening period. So far as the record is concerned, Winters was just as available to the government for purposes of the motions hearing as he was to the defense. Given the failure of either side to call him, his testimony at Smith's trial is the only account that he has given of Frederick's role or lack thereof in the murder of Lonnie Hart.

According to the government, developments since Smith's trial demonstrate that Winters was committing perjury when he absolved Frederick of any role in the killing. These allegations, however, are limited to representations by counsel. No evidence supporting these representations was produced by the government in opposition to Frederick's § 23–110 motion. The government did not call Winters as a witness at the hearing to recant or modify his prior testimony, nor did it present any evidence that Winters had lied at Smith's trial.[24] We therefore find the government's position unpersuasive.[25]

23. We also note that if Winters had testified, there would have been less reason for Frederick to do so. As a result of Frederick's taking the stand, the jury learned of his prior convictions. Empirical studies, discussed in *Byrd, supra,* 614 A.2d at 31 & n. 12, disclose that jurors are substantially more likely to find a defendant guilty in a close case if they are apprised that he has previous convictions.

24. We note that if, as the government suggests, some of Winters' evidence at Smith's trial was false, then other parts of it may have been false too.

25. The prejudice to Frederick generated by defense counsel's failure to present Winters'

testimony was compounded by groundless promises which were improvidently made by Frederick's attorney in his opening statement. The defense theory of the case, counsel told the jury, was that "on March 3, 1989, Michael Smith shot and killed Lonnie Hart.... In fact, you will learn through the evidence that Mr. Smith was identified as the person who killed Lonnie Hart, and most of this will come from the government's witnesses." So far as we can discern from the record, Frederick's attorney had no basis whatever for the quoted representation.

It is unprofessional conduct for counsel to "allude [in his opening statement] to any evidence unless there is a good faith and reason-

## III.

## CONCLUSION

We recognize that any new trial of Frederick will come eleven years or more after the murder of Lonnie Hart. It may well be difficult for prosecutors to reassemble the case against the defendant. Recollections may well have become hazy, and witnesses (perhaps, unfortunately, even Eric Winters [26]) may not be easy to find. But the "societal costs of reversal and retrial are an acceptable and often necessary consequence when an error in the first proceeding has deprived a defendant of a fair determination of the issue of guilt or innocence." *Mechanik, supra,* 475 U.S. at 72, 106 S.Ct. 938.

For the foregoing reasons, the order denying Frederick's § 23–110 motion is reversed. In No. 93–CF–621, Frederick's convictions are vacated.[27] The case is remanded for a new trial or other appropriate proceedings consistent with this opinion.[28]

*So ordered.*[29]

able basis for believing [that] such evidence will be tendered and admitted...." ABA STANDARDS FOR CRIMINAL JUSTICE 7.4 (The Defense Function) (1993). It is unlikely that, in this case, the jurors failed to notice the significant gap between counsel's promise of evidence and the evidence that they actually heard.

26. We express the hope, however, that given the history of this case, Frederick's new counsel has kept track of the whereabouts of this particular witness.

27. Frederick filed a separate *pro se* notice of appeal in No. 97–CO–1834. He has not prosecuted that appeal, and it is hereby dismissed.

28. As previously noted, the government claims that certain letters allegedly written by Frederick to Smith contain admissions of guilt. The prosecutor's requests to the court for exemplars of Frederick's handwriting (in order to determine whether Frederick wrote the letters) were not timely made and were denied. In the event of a new trial, the government will have ample time to secure the necessary exemplars.

29. We note one additional issue that might arise if Frederick is retried. The prosecutor at Frederick's second trial argued that Smith had satisfied his obligations under his cooperation agreement with the government by testifying at the defendant's first trial, and that at the second trial, the agreement no longer had any relevance as providing a possible motive for Smith to incriminate Frederick. This argument was without any basis in the record. It was altogether improper and should not be repeated at any future trial.