**Sherman Woodrow DOBSON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 94–CO–1689.**

District of Columbia Court of Appeals.

Argued Feb. 19, 1998.
Decided April 16, 1998.

---

John T. Moran, Washington, DC, appointed by the court, for appellant.

Rachel Carlson Lieber, Assistant United States Attorney, with whom Mary Lou Leary, United States Attorney at the time the brief was filed, and John R. Fisher, Thomas C. Black, Rachel Adelman–Pierson, and Chrisellen R. Kolb, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, SCHWELB, and REID, Associate Judges.

SCHWELB, Associate Judge:

This is an appeal by Sherman W. Dobson from an order of the trial court denying Dobson's motion, filed pursuant to D.C.Code § 23–110 (1996), to set aside his convictions in 1980 of armed robbery[1] and of carrying a pistol without a license (CPWOL).[2] Dobson claims that his trial counsel was constitutionally ineffective. The trial judge held that Dobson was not prejudiced by any deficiency in his attorney's performance and that no hearing on the motion was required. Primarily because the judge failed to address Dobson's most persuasive argument, we reverse.

## I.

### FACTUAL BACKGROUND

A. *The evidence.*

In the late evening of June 6, 1978, Edward Sawyer, a special police officer at How-

---

1. D.C.Code §§ 22–2901, –3202 (1996).

2. D.C.Code § 22–3204 (1996).

ard University, was robbed at gunpoint by two men. On January 10, 1979, a grand jury returned an indictment charging Dobson and James Harris with the crime.

On October 14 and 15, 1980, Dobson was brought to trial in the Superior Court. The case against Dobson consisted primarily of Officer Sawyer's identification testimony against him.[3]

Although no transcript of the trial is now available, it appears from the parties' briefs in Dobson's initial appeal[4] that the identification testimony was somewhat problematic. Specifically, Sawyer testified at trial that the following identification procedures had taken place:

1. On June 26, 1978, less than three weeks after the robbery, Sawyer selected Dobson's picture from a photo array as the more light-skinned of the two robbers. According to Dobson's brief, however, Sawyer stated that he was only "45 to 60 percent sure" of his identification.

2. Fifteen days later, on July 11, 1978, at a lineup at Metropolitan Police headquarters, Sawyer selected two individuals other than Dobson as the robbers.

3. On November 21, 1978, nearly six months after the robbery, Sawyer viewed a second lineup, this one in Baltimore. On this occasion, Sawyer identified Dobson as one of the robbers. The individual whom Sawyer had identified at the first lineup as the "light-skinned" robber did not participate in the Baltimore lineup.

4. On October 15, 1980, two years and four months after the robbery, Sawyer identified Dobson in the courtroom as one of the men who robbed him.

The defense introduced into evidence a videotape of the initial lineup at which Sawyer had identified two men other than Dobson as the perpetrators of the crime. Dobson's attorney called no witnesses. Dobson

was found guilty of armed robbery and CPWOL, and he was sentenced to serve a total of eighteen years and four months to life. The judge ordered that Dobson's prison term be served consecutively to any other sentence.

## B. *The prospective alibi.*

Dobson's trial counsel told the jury in his opening statement that he would present testimony establishing that, on June 6, 1978, Dobson was at a party in Baltimore and could not have been on the campus of Howard University at the time that Sawyer was robbed. During the *voir dire* proceedings to select the prospective jurors, counsel introduced three prospective alibi witnesses to the jury. These witnesses were Imogene (Jean) Harris, the mother of Dobson's child, Dr. Eric B. Dobson, a physician who is Sherman Dobson's brother, and Steve Cole, a cousin of Ms. Harris.

Notwithstanding the representation made in his opening statement that Dobson was in Baltimore when the crime was committed, defense counsel did not call any of the alibi witnesses to the stand. At the beginning of his rebuttal argument, the prosecutor pounced on the defense's failure to produce the evidence that counsel had promised:

Ladies and gentlemen, defense attorney talked about all this evidence that the government could have gotten. The government could have got this witness from over here and the government could have got this witness from over there and said this and said that. But, that's the same defense attorney who stood right here yesterday and told you, "I'm going to bring in witnesses to say Mr. Dobson was somewhere else on June the 6th, 1978." Didn't he say that? He said it right to you. He stood right there and told you that. And, now, he's telling you a different story.

---

3. The government also proved that the fruits of the robbery—Sawyer's radio and handgun—were recovered from Harris' attic bedroom. According to Dobson's brief on direct appeal from his convictions, it was established that Dobson and Harris were friends and that Dobson had been at Harris' home during the month in which the robbery was committed.

4. Dobson's brief in the direct appeal contains a more detailed description of the trial testimony than the government's brief does. The government did not contest, in its brief, Dobson's recitation of the evidence of record.

He's saying now that Mr. Dobson was not in Washington, D.C. on June the 6th, 1978. But he told you, if you recall, yesterday that Mr. Dobson was in Baltimore on June 6th, 1978.

Let's not talk about things on one side. Let's counterbalance and talk about what happened on the other side, too. You can't put all the weight on the government, can you?

The defense did not object to this argument.

### C. *The direct appeal.*

Dobson filed a timely direct appeal from his conviction. His principal contention was that he had been denied rights protected by the Interstate Agreement on Detainers, D.C.Code § 24–701 (1973). Dobson also asserted that the prosecutor had "shifted" the burden of proof during rebuttal argument and that the trial judge had committed plain error by not intervening *sua sponte* to prevent this "shifting." This court rejected Dobson's contentions and affirmed his convictions, and the Supreme Court declined to review his case. *See Dobson v. United States,* 449 A.2d 1082, 1084 n. 7 (D.C.1982), *cert. denied,* 464 U.S. 831, 104 S.Ct. 109, 78 L.Ed.2d 111 (1983) (*Dobson I* ).

### D. *The § 23–110 motion.*

On March 24, 1993, almost eleven years after the affirmance of his conviction, Dobson filed a *pro se* motion to vacate his sentence, alleging that his trial counsel had been constitutionally ineffective. On January 25, 1994, in a supplement to his motion, Dobson based his claim of defective performance largely on counsel's actions in first informing the jury that he would present alibi witnesses but then resting his case without doing so. Dobson also complained of his attorney's failure to object to the prosecutor's rebuttal argument.[5]

Dobson's motion was accompanied by the affidavits of the three putative alibi witnesses. In the most detailed and specific of these affidavits, Ms. Harris stated that Dobson and the three affiants were together at her apartment in Baltimore from 9 p.m. to midnight on June 6, 1978, and that there was no doubt about the date of the event:

> There was no real reason for this get-together, as Eric and Steve had just dropped by, but when Sherman was asked by his brother the reason for his drinking beer (which was unusual for Sherman) Sherman replied in his characteristic wit that he was celebrating "D–Day." [6] Sherman then explained that his being home from prison a month had coincided with the actual D–Day and Sherman said he was just taking the time to relax and unwind.

Ms. Harris further stated in her affidavit that she, Cole and Dr. Eric Dobson received subpoenas for Sherman W. Dobson's trial, that all three of them were introduced to the jury panel, but that they were never called to testify.[7]

In a *pro se* submission in support of his motion, Dobson argued, *inter alia,* that

> [b]y resting without presenting any evidence in favor of the defense, counsel left the jury free to believe [the prosecution's] account of the incident as the only account. In fact, counsel's opening primed the jury to hear a different version of the incident. When counsel failed to produce this version, the jury likely concluded that counsel could not live up [to] the claims made in the opening.

Defendant's Supplemental Brief in trial court at 3 (quoting *Harris v. Reed,* 894 F.2d 871, 879 (7th Cir.1989)). Dobson also quoted from *Anderson v. Butler,* 858 F.2d 16, 19 (1st Cir.1988):

> [W]e cannot but conclude that to promise even a condensed recital of such powerful

---

5. Dobson made several other allegations of ineffectiveness which we find it unnecessary to reach.

6. D–Day, June 6, 1944, was of course the day on which the allied powers began the invasion of Normandy and opened the "second front" during World War II.

7. In a somewhat less elaborate affidavit, Dr. Eric Dobson described the same party to celebrate his brother's release from prison a month earlier, but stated that the event occurred in the "early summer." Technically, June 6, 1978 was in the late spring.

[psychiatric] evidence, and then not produce it, could not be disregarded as harmless.

### E. *The government's response.*

In response to Dobson's motion, the government asserted that Dobson had demonstrated neither deficient performance on the part of his counsel nor prejudice in the *Strickland*[8] sense. The government further argued that no hearing on the motion was required. With its response, the government submitted an affidavit from Dobson's trial attorney. In that affidavit, counsel explained that, thirteen years after the fact, he had "little memory of specific events which occurred during [Dobson's] trial." The affidavit continued as follows:

I have no specific recollection of my reasons for not calling these witnesses. My notes indicate that presenting an alibi defense through these witnesses would necessarily have put one or more incidents of Mr. Dobson's prior criminal conduct before the jury, because the witnesses claimed to recall the date in question as one month after Mr. Dobson was released from jail. I believed then (and believe now) that evidence indicating prior criminal conduct is often highly prejudicial to a defendant. My notes also indicate that the government's case was based on the testimony of a single eyewitness, Mr. Edward Sawyer, and that there was some question as to the reliability of his identification. Based on my general experience in defending criminal cases, I expect that my decision whether to put on an affirmative defense would have depended in large part on my evalua-

tion during trial of the strength of Mr. Sawyer's testimony.

The witnesses in question were under subpoena and available to testify. Thus, it is not likely that I simply forgot to call them.

### F. *The trial judge's decision.*

On November 10, 1994, the trial judge denied Dobson's motion without a hearing. Apparently understanding the issue to be whether trial counsel was ineffective in failing to call the three alibi witnesses,[9] the judge did not address at all Dobson's principal complaint, namely, that defense counsel announced in his opening statement that alibi testimony would be presented but had then failed to present that testimony. Concluding that Dobson had not made an adequate showing of prejudice, the judge expressly declined to make a finding as to *Strickland's* "defective performance" prong, noting that "the [c]ourt need not and should not consider the adequacy of counsel's performance if it finds that defendant has not established prejudice." (Citations omitted.) The judge concluded by denying Dobson's motion without a hearing.

## II.

## LEGAL DISCUSSION

### A. *The Strickland standard.*

The standards which govern claims of ineffective assistance of counsel have been articulated by the Supreme Court:

**8.** *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**9.** As to that issue, the judge wrote, in pertinent part:

Defendant submitted the affidavits of Dr. Eric Dobson, defendant's brother, and Jean Harris, who was the Defendant's live-in girlfriend at the time of the robbery. Harris' affidavit, dated January 2, 1993, stated that Dobson was at her house from 9:00 p.m. until midnight on June 6, 1978 at a gathering celebrating the one month anniversary of his release from prison. Dr. Dobson stated in an affidavit, dated November 11, 1992, that "in the early summer of 1978," he attended a party celebrating defen-

dant's having been home from prison for a month.

The Defendant did not submitted [sic] any records detailing exactly when he was released from prison. Dr. Dobson's affidavit alluded to early summer as the time of the gathering. This time is clearly three (3) weeks after the alleged gathering occurred. The Defendant offered no reasons why he waited more than a decade to raise this claim since the information was available since his trial in October of 1980. Due to the fact that the Defendant took more that a decade to bring this collateral attack, it diminishes the credibility of the Defendant's motion. *Ramsey v. United States,* 569 A.2d 142, 149 (D.C.1990).

First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland, supra,* 466 U.S. at 687, 104 S.Ct. at 2064. In the present case, the trial judge declined to make a finding with respect to *Strickland's* "deficient performance" prong. The parties agree that, at least on the limited paper record before us, we are in no position to make an appellate finding as to whether counsel's representation of Dobson was "reasonable[ ] under prevailing professional norms." *Id.* at 688, 104 S.Ct. at 2065. Accordingly, our inquiry must focus on *Strickland's* "prejudice" prong.

█ In order to show prejudice in the *Strickland* sense, Dobson must demonstrate a

"reasonable probability" that, but for his trial attorney's deficient performance, the outcome of the case would have been different. He need not demonstrate, however, that it is more likely than not that it was counsel's poor showing that made the difference between conviction and acquittal. *Strickland, supra,* 466 U.S. at 693 [104 S.Ct. at 2067].

[T]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

*Mack v. United States,* 570 A.2d 777, 784 (D.C.1990) (quoting *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. at 2068).

B. *The right to a hearing.*

█ Section 23–110 (c) states:

Unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the prosecuting authority, grant a prompt hearing thereon, determine the issues, and make findings of fact and conclusions of law with respect thereto.

In light of the foregoing provision, there is a presumption that a trial court presented with a § 23–110 motion alleging the ineffective assistance of counsel should conduct a hearing. *Ramsey v. United States,* 569 A.2d 142, 147 (D.C.1990). In order to uphold the denial of a § 23–110 motion without a hearing, we must be satisfied that "under no circumstances could the petitioner establish facts warranting relief." *Id.* (quoting *Fontaine v. United States,* 411 U.S. 213, 215, 93 S.Ct. 1461, 1463, 36 L.Ed.2d 169 (1973)). This court has recognized three categories of claims that do not merit a hearing:

(1) vague and conclusory allegations;

(2) palpably incredible claims; and

(3) assertions that would not merit relief even if true.

*Id.*

C. *The trial court's rationale.*

█ The trial judge's reasons for denying the motion without a hearing do not persuade us. The judge failed altogether to address Dobson's most plausible claim, namely, that counsel's promise of an alibi in his opening statement, combined with his subsequent failure to present available alibi testimony, substantially prejudiced Dobson's defense. The potential harm that may flow from such a scenario has been recognized by the courts in the decisions cited by Dobson to the trial judge. *See Harris, supra,* 894 F.2d at 879; *Anderson, supra,* 858 F.2d at 19. The appearance that the defense has overstated its evidence, and cannot be trusted to keep its promises, may have a significant effect on the jury's evaluation of a case, and especially of a close case. In the absence of a finding by the judge addressing Dobson's main contention, we are compelled to conclude that the order denying the motion without a hearing was based on a misapprehension as to the precise issue before him.[10]

D. *Dobson's delay.*

In light of the foregoing discussion, the issue before us would not be a difficult one if

---

10. The judge also appeared to believe that the affidavits of Dobson's alibi witnesses were patently incredible. The judge focused on the discrepancy in Dr. Dobson's affidavit, see note 7, *supra,* but failed to address Ms. Harris' statement that Dobson proclaimed a celebration of D–Day, and thus of the sixth of June—the very evening

**84**

Dobson had acted promptly to vindicate his rights. In fact, however, eleven years elapsed between this court's decision in *Dobson I* and the filing of Dobson's § 23–110 motion. Any further factual inquiry in 1998 will embrace events that occurred twenty years ago, and a trial that took place eighteen years ago. Under these circumstances it is not at all surprising that trial counsel's recollection of the relevant events has faded. Indeed, as a result of Dobson's delay, it may be difficult for the court to evaluate retrospectively Dobson's claim that his attorney's performance at trial fell short of the *Strickland* standard.

Moreover, with so much time having passed, the case bristles with potential prejudice to the prosecution. We paraphrase our observations under similar circumstances in *Legrand v. United States,* 570 A.2d 786 (D.C. 1990):

> If there had been a timely [§ 23–110 motion], the transcript would probably still have been available. Moreover, if the judgment had been reversed following such an appeal, and if a new trial had been ordered, the government might still have been in a position to present its evidence. Whether the government could now reassemble its proof of an [offense] that allegedly occurred in [June 1978] is surely dubious to say the least. By waiting so long to launch his collateral attack, [Dobson] has almost certainly made it exceedingly difficult and perhaps impossible for the government to retry him.

*Id.* at 791 (footnote omitted). We stated in *Legrand* that "a substantially greater show-

ing of injustice is necessary to obtain relief in a collateral proceeding than on direct appeal." *Id.*[11]

■ But the "lapse of time and prejudice to the government cannot, by themselves, bar a § 23–110 motion...." *Ramsey, supra,* 569 A.2d at 148.[12] We declined in *Ramsey* to adopt judicially a legislatively enacted federal rule permitting dismissal of collateral proceedings on the ground of inexcusable delay which has prejudiced the government. *Id.* at 149–50. *Ramsey* is binding authority, and therefore we are not free to follow decisions applying the Congressionally enacted federal doctrine. *See, e.g., Rizzo v. United States,* 821 F.2d 1271, 1272–73 (7th Cir.1987).

On remand, however, the trial court "may consider the length of [Dobson's] delay ..., any excuses for that delay, and any resulting prejudice to the government...." *Ramsey, supra,* 569 A.2d at 149 (citation omitted).[13] "[L]apse of time affects the quantum of required proof, as well as the good faith and credibility of the moving party." *Id.* (quoting *United States v. Wiggins,* 184 F.Supp. 673, 676 (D.D.C.1960)). Finally, if the passage of time has impaired the recollections of participants in the trial—if, for example, Dobson's trial counsel no longer remembers events which he might very well have recalled if Dobson had filed his motion soon after his conviction—then it is the party responsible for the delay that must be chargeable with the consequences.

## III.

### CONCLUSION

For the foregoing reasons, the order denying Dobson's § 23–110 motion without a

---

on which Officer Sawyer was robbed in Washington, D.C.

**11.** In *Shepard v. United States,* 533 A.2d 1278 (D.C.1987), this court held that a defendant who fails to raise a claim of ineffective assistance of trial counsel during the pendency of his direct appeal will ordinarily be precluded from raising the claim thereafter in the absence of a showing of cause and prejudice. *Id.* at 1280–82. *Shepard,* however, applies only to cases tried after December 1987, *id.* at 1282, and therefore does not govern the present appeal.

**12.** *Ramsey* involved a motion to withdraw a guilty plea based on the ineffective assistance of

counsel, but the holding of that case applies with equal force here.

**13.** An evidentiary hearing may be required on remand in order to make an informed assessment with respect to these and other issues. We express no opinion, however, as to whether an informed decision may be made without a hearing with respect to *Strickland's* "deficient performance" prong. *Compare Anderson, supra,* 858 F.2d at 19, *with id.* at 21–22 (Breyer, J., dissenting), *and with Howard v. Davis,* 815 F.2d 1429, 1432–33 (11th Cir.), *cert. denied,* 484 U.S. 864, 108 S.Ct. 184, 98 L.Ed.2d 136 (1987).

hearing is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*[14]

---

**14.** On remand, the trial judge is required to address only Dobson's claim that his attorney was ineffective by promising in his opening statement to present alibi witnesses and by the failure to keep his promise. We discern no abuse of discretion by the trial judge in the disposition of Dobson's remaining claims.

During the pendency of this appeal, Dobson's attorney requested this court, by motion, to direct the trial court to prepare a statement of proceedings in lieu of the lost transcripts. A motions division of the court referred Dobson's motion to the merits panel. Especially in light of Dobson's lengthy delay, we now deny that motion.