Sherman W. DOBSON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 00–CO–243, 01–CO–319.

District of Columbia Court of Appeals.

Argued Feb. 26, 2002.
Decided Jan. 23, 2003.

Douglas Wham, appointed by the court, for appellant.

Lisa H. Schertler, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Mary Patrice Brown, and Carolyn K. Kolben, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and WASHINGTON, Associate Judges, and KING, Senior Judge.

PER CURIAM:

In these consolidated appeals, Sherman W. Dobson contends that the trial court erred in denying his requests for relief in two separate motions filed pursuant to D.C.Code § 23–110. In No. 00–CO–243, the motion was denied after a hearing on December 19, 1999, and in No. 01–CO–319, the motion was denied without a hearing on February 2, 2001. The facts underlying each appeal are set forth in the opinion filed by Senior Judge King. In No. 00–CO–243, Judge Schwelb has filed a concurring opinion and Judge Washington has filed a dissenting opinion.

The judgment in both appeals is affirmed. With respect to No. 00–CO–319, Judge Schwelb and Judge Washington join

in Parts I–C and II–B of Senior Judge King's opinion. That case is remanded for resentencing on the charge of carrying a pistol without a license (CPWL).[1]

*So ordered.*

KING, Senior Judge:

Sherman W. Dobson was convicted of armed robbery, in violation of D.C.Code §§ 22–2901, –3202 (currently at D.C.Code §§ 22–2801, –4502 (2001)), and CPWL, in violation of D.C.Code § 22–3204 (currently at D.C.Code § 22–4504 (2001)). These convictions were affirmed on direct appeal. *See Dobson v. United States,* 449 A.2d 1082 (D.C.1982) (*Dobson I*), *cert. denied,* 464 U.S. 831, 104 S.Ct. 109, 78 L.Ed.2d 111 (1983). Subsequently, Dobson filed two motions, pursuant to D.C.Code § 23–110, contending in both that his trial counsel was constitutionally ineffective. Dobson appeals the denial on December 19, 1999— after a hearing—of the first § 23–110 motion (No. 00–CO–243), and the denial on February 2, 2001—without a hearing—of the second § 23–110 motion (No. 01–CO– 319).

I.

A. *Procedural history*

On October 15, 1980, Dobson was convicted by a jury of armed robbery and CPWL, offenses committed on June 6, 1978, when Dobson and his accomplice, James Harris,[1] robbed Edward Sawyer at gun point. The government's case depended almost entirely upon the eyewit-

---

1. Dobson contends, and the government concedes, that the sentence on the CPWL count is illegal because the enhancing conviction occurred after the robbery for which he was convicted. We agree. *See Cornwell v. United States,* 451 A.2d 628, 629–30 (D.C.1982) (holding that plain meaning of enhancement provision of repeat offender statute, D.C.Code § 22–104(a) (1973), required *prior* convic-

tion); *United States v. Hilliard,* 366 A.2d 437, 439–40 (D.C.1976) (holding that plain meaning of mandatory minimum sentencing provision of D.C.Code § 22–3202(a)(2) (1973), required *prior* conviction). Therefore, the case is remanded for resentencing on that count.

1. Harris pleaded guilty to the armed robbery before Dobson's trial on these charges.

ness identification testimony of Sawyer, a Howard University police officer. Dobson was sentenced to fifteen years to life on the armed robbery charge, and to a consecutive sentence of ten years on the CPWL charge. On direct appeal, Dobson's convictions were affirmed, but the case was remanded for imposition of a minimum sentence on the CPWL conviction. *See Dobson I,* 449 A.2d at 1087. In March 1983, the trial court resentenced Dobson to forty months to ten years on the CPWL charge, consecutive to the fifteen years to life sentence for armed robbery.

On March 24, 1993, nearly eleven years after the affirmance by this court of his convictions, Dobson filed a *pro se* motion under § 23–110 (first 23–110 motion), arguing that his trial counsel had been constitutionally ineffective under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). On January 25, 1994, Dobson supplemented that motion to include the claim made here, *i.e.,* that his trial counsel was ineffective because he did not present alibi witnesses after he had told the jury that he would present that defense. Concluding that Dobson was not prejudiced by any of the claimed deficiencies in his attorney's performance, the trial court denied the motion without a hearing. On appeal, this court reversed and remanded the case, holding that a hearing on the motion was required, because "[t]he

[trial] judge failed altogether to address Dobson's most plausible claim, namely, that counsel's promise of an alibi in his opening statement, combined with his subsequent failure to present available alibi testimony, substantially prejudiced Dobson's defense." *Dobson v. United States,* 711 A.2d 78, 84–85 (D.C.1998) (*Dobson II* ). The court directed that the hearing on the first 23–110 motion was "to address only Dobson's claim that his attorney was ineffective by promising in his opening statement to present alibi witnesses and by the failure to keep his promise."[2] *Id.* at 85 n. 14.

### B. *Hearing on the first 23–110 motion*

After the remand, the trial court conducted an evidentiary hearing on the first 23–110 motion, receiving testimony on June 16, November 12, and December 16, 1999. The only issue before the court was whether Dobson's trial counsel was constitutionally ineffective for promising an alibi defense in the opening statement and then deciding not to present the alibi testimony at trial. Both Dobson and his trial counsel, Andrew Lipps, testified.

### 1. *Lipps's testimony*

Lipps testified[3] that a few weeks before trial, Dobson advised Lipps how to contact three potential alibi witnesses. Lipps also

**2.** This court also held that the trial court did not err in rejecting Dobson's remaining ineffective assistance of counsel claims. Dobson had also contended that Lipps was constitutionally ineffective for failing to object to the government's rebuttal argument. *Id.* at 81 n. 5, 85 n. 14. Other claims of ineffective assistance concerned unrelated robbery charges that were severed from the charges in this case, the third of three robbery trials.

**3.** There was no trial transcript available at the 23–110 hearing, presumably due to the 19-year gap between the trial and the hearing.

Lipps's hearing testimony was reconstructed from his trial notes, a memo he had prepared after the verdict, and his own recollection of his customary trial tactics. In *Dobson II,* we stated that "if the passage of time has impaired the recollections of participants in the trial—if, for example, Dobson's trial counsel no longer remembers events which he might very well have recalled if Dobson had filed his motion soon after his conviction—then it is the party responsible for the delay that must be chargeable with the consequences." *Id.* at 84.

testified that he had discussed with Dobson the possibility of putting on an alibi defense before he received the letter.[4] Lipps told the trial court that he "was prepared as of the morning of the trial to present an alibi defense," an assertion supported by the existence of subpoenas issued for all three alibi witnesses. The alibi witnesses in question were Jean Harris, the mother of Dobson's child; Dr. Eric B. Dobson, a physician who is Dobson's brother; and Steve Cole, Jean Harris's cousin. According to Lipps, these witnesses were credible because he "wouldn't proffer even in an opening statement an alibi defense if [he] thought the witnesses weren't worthy of being put on." The witnesses were expected to testify that they and Dobson were in Baltimore, Maryland, at a party on the night of the robbery.

Lipps acknowledged that during opening statement he told the jury he would be presenting an alibi defense and during jury selection he introduced the three witnesses expected to support the alibi. In addition, an October 31, 1980, post-trial memorandum prepared by Lipps for the Public Defender Service appellate section, outlined possible issues on appeal, including a reference to the alibi mentioned in his opening statement.[5] Lipps explained why he informed the jury in the opening statement about the alibi and the alibi witnesses:

It is a tactical decision in every case whether to announce a defense in opening statement at the outset or to reserve the opening statement until the begin-

ning of the defense case. I have handled the practice in—depending on the case, in different ways.

In this case, it seemed to me it was useful to introduce the alibi defense and important to introduce the alibi defense at the outset for the following reasons. First, as I mentioned earlier, a jury will often form opinions of a case early on. And to simply have them listen to the entire case without any knowledge of what sort of defense was to come puts you behind the 8–ball.

In this case, it seems to me I would have known, from talking to the three witnesses, that they were three presentable witnesses, certainly, particularly Mr. Dobson's brother who was then, I gather from my written notes, in medical school.

And third, unlike some cases where it is hard to have a precise knowledge of what the government's case is going to look like, in this case we had an extensive pretrial identification hearing. And so I thought at the time, at least according to my reconstruction, that I knew well what the government's chief identification witness was going to testify. And, therefore, felt reasonably certain that it would be necessary and appropriate to put on an alibi defense . . . .

So I think the question of whether to put on a—testify about a defense in opening statement or not depends upon the facts of each case. And I do believe that there was an appropriate basis to identify an alibi defense at the time of the initial opening. If I had an uncer-

---

4. Lipps had no independent recollection that he knew of the potential alibi before he received the September 14 letter, but was "reasonably certain" that he was aware of that possibility from his examination of documents, including his handwritten notes, and by constructing a sequence of events.

5. In the October 31, 1980, post-trial memorandum, Lipps wrote, "I announced quite fully in opening statement that we would introduce an alibi defense, and introduce to the jury the three witnesses who we had about that defense. I further spelled it out in some detail."

tainty as to what sort of defense Mr. Dobson would assert, then it would be more reasonable to wait until the defense case before giving an opening statement.

But here there was no question that Mr. Dobson had told me, as reflected in his September 14th letter, that he was not at the place of the offense at the time it occurred and, indeed, had an alibi. And I checked that out with each of the three witnesses who confirmed that.

Now, I hasten to add, this is all by way of reconstruction, and not by way of actual independent memory.

However, after the government presented its case, Lipps decided not to present any of the alibi witnesses or to advance the alibi defense because, in his opinion, the government's case was not nearly as strong as he had anticipated. Lipps did present the videotape of the first lineup where Sawyer selected two people other than Dobson as the robbers.

Lipps explained that Sawyer's identification testimony at trial was much weaker than he had expected. According to Lipps, "[t]hings apparently changed midway through the actual trial when the witnesses' [sic] testimony reflected a far greater degree of uncertainty than I had any reason to expect, based upon the pretrial hearing,[6] in which case we—I say we. I mean Mr. Dobson and myself made a decision not to put on an alibi defense." Further, in Lipps's October 31, 1980, post-trial memorandum, he wrote, "[b]ecause we believed (wrongly, as it turned out) that the government's case was weak, we chose not to introduce this alibi defense."

Because the strength of Sawyer's testimony is central to this appeal we will review Lipps's testimony regarding the four separate identifications that took place. The first occurred three weeks after the robbery, on June 26, 1978, in the form of a photo identification. Sawyer selected Dobson from an array of photographs, and Lipps testified that Sawyer said at the suppression hearing that he was 75 to 80 percent certain of that identification. The second identification proceeding was a lineup held on July 11, 1978. At that lineup, Sawyer selected two people other than Dobson as the robbers. According to Lipps's October 16, 1980, post-trial memorandum to the Public Defender Service, the police told Sawyer that "he had picked out the wrong person."[7] Lipps stated, however, that Sawyer had explained at the pretrial suppression hearing that he had told the police that the people he had identified "weren't really the people at the robbery but looked like the people." The third opportunity came during a second lineup almost six months after the robbery, in which Sawyer identified Dobson as one of the robbers. Finally, at trial, more than two years after the robbery, Sawyer made an in-court identification of Dobson.

Lipps described Sawyer's testimony at the suppression hearing as "strong and clear," providing an "adequate explanation" of the reason he selected two different people rather than Dobson at the first lineup. As a result of that assessment Lipps decided that the alibi defense should

---

**6.** A motion to suppress identification had been denied pretrial after an evidentiary hearing during which Sawyer—the victim and only eyewitness—testified.

**7.** Although the record is not explicit on this point, it is fair to infer from this remark, and the fact that the lineup was conducted shortly after Sawyer's photo identification of Dobson that Dobson was one of the people standing in the lineup, and that Sawyer identified two other people as the two participants in the robbery.

be presented at trial. On cross-examination at trial, however, Sawyer indicated a far less degree of certainty concerning his initial photo identification. With respect to Sawyer's trial testimony, Lipps stated:

The question of his reliability that I referred to becomes crystal clear when you look at my notes of his trial testimony where I take, as you see, virtually verbatim notes of his direct testimony.

And then after my cross-examination I come back to the stand, I'm not taking notes as I'm writing, and I write in a box, and I don't have it in front of me, but it says basically 45 to 60 percent certain of identification. I put a box around these notes. I star it out in the margin.

An examination of Lipps's trial notes reveals a starred entry, "40 to 60% certain at photo." [8] Lipps stated that Sawyer's trial testimony, reducing the degree of certainty regarding his initial photo identification from 75 to 80 percent to 40/45 to 60 percent, "was a critical change and great for the defense in his testimony where he had indicated under oath a degree of uncertainty that he hadn't indicated either in the prior investigator's statement [9] nor in a sworn pretrial testimony under oath." In large part, because Sawyer stated a lesser degree of certainty at trial, which caused an "apparent weakness of the government's case," Lipps decided not to present the alibi witnesses. Instead, Lipps rested the defense case after presenting a videotape of the lineup in which Sawyer selected two individuals, neither of whom were Dobson. Finally, during closing argument, Lipps "alluded to [the government's weakness] briefly in front of the jury and told them that we chose not to dignify the government's case with the defense."

Lipps also testified that another reason for not presenting the testimony of the alibi witnesses was the danger that the jury would learn about Dobson's prior criminal conduct. More specifically, the witnesses would have testified that they were with Dobson in Baltimore on the night of the robbery celebrating his one-month release from jail on an unrelated charge, and Lipps feared that the reason for having the party would be revealed during cross-examination. According to Lipps's notes, the witnesses referred to the day as "D–Day," or Dobson Day, June 6, 1978. Lipps testified that he was concerned that a reference to Dobson's prior criminal record would have been highly prejudicial to his defense. Lipps also testified that the decision not to put on the alibi testimony was made in consultation with Dobson. Finally, Lipps's decision not to present the witnesses was made after he had the opportunity to think about and discuss the pros and cons with his colleagues at the Public Defender Service.

### 2. Dobson's testimony

Dobson's testimony largely was consistent with Lipps's testimony except for disagreement on whether Dobson agreed with the decision not to present the alibi witnesses. Dobson testified that Lipps did

8. I place no significance on the discrepancy between Lipps's testimony at the 23–110 hearing that Sawyer was 45 to 60 percent certain of the photo identification, and his trial notes indicating that Sawyer was 40 to 60 percent certain at photo.

9. Sawyer gave a statement to an investigator of the Public Defender Service on June 28, 1979, in which he described how he picked Dobson, who he called "Suspect # 2," out of a photo array consisting of 45 to 50 mug shots. Sawyer stated that he was 75 to 80 percent certain that "Suspect # 2" was the same person in the picture. He also indicated that he did not pick "Suspect # 2" out of a lineup a month after the photo array, but that he did pick "Suspect # 2" out of a later lineup.

not want to present the alibi witnesses after the government rested its case. Dobson told Lipps that he thought abandoning the alibi was a "bad idea ... because they had been introduced to the jury and they would be expecting to hear from [the] alibi witnesses." When asked to explain why it was important to put on the witnesses after introducing them, Dobson stated:

> Because we had introduced them to the jury and basically it has always been— maybe perhaps it's the way I have been raised with things that come along when. But when you promise somebody something, you need to deliver. And if you don't, generally people feel that you can't.
>
> In our neighborhood, we say, "put up or shut up," or "put your money where your mouth is." It was that type of situation that we introduced them, and the jury would be expecting them. Anything less would just be probably looked upon as we were bluffing or that we couldn't deliver.

In addition, Dobson testified that the final decision on whether to abandon the alibi was Lipps's to make, but that Lipps knew Dobson wanted to advance the alibi defense. Dobson remembered Lipps stating in his closing argument that, because the government had not proved its case with Sawyer's testimony, he was not going to dignify the government's case by presenting the alibi witnesses.[10]

### 3. *Trial court's ruling*

The trial court issued an oral ruling after the close of testimony on December 16, 1999. The court found there was no indication that the alibi witnesses would have testified differently than what Lipps stated in his opening argument. The trial court also credited Dobson's testimony that Lipps and he did not agree on the decision not to put on the alibi defense. The trial court, however, found that Lipps's decision of whether or not to put on the witnesses was a tactical one. Accordingly, the trial court ruled that Lipps's decision not to put on the alibi witnesses was not deficient performance within the meaning of the first prong of *Strickland.*[11]

### C. *Second 23–110 motion*

On October 22, 2000, while the appeal from the denial of the first 23–110 motion was pending in this court, Dobson filed a second 23–110 motion setting forth two claims for relief. First, Dobson contended that his trial counsel was ineffective for failing to interview and make available for trial James Harris, his accomplice. In support of his motion, Dobson submitted a signed statement from Harris, in which Harris said that he and another man—not Dobson—committed the robbery of Edward Sawyer on June 6, 1978. Second, Dobson claimed that his CPWL sentence impermissibly was enhanced because the conviction used as a basis to enhance his sentence occurred after the date of robbery for which he was convicted.

---

10. Dobson's recollection is supported by Lipps's October 31, 1980 memorandum, in which he wrote, "During my closing argument, I alluded to [the government's weakness] in front of the jury and told them that we chose not to dignify the government's case with the [alibi] defense." Lipps also wrote that only in the rebuttal portion of its closing argument did the government "briefly refer" to the absence of the alibi witnesses. In *Dob-*

*son II,* however, the court noted that "the prosecutor pounced on the defense's failure to produce the evidence that counsel had promised." *Dobson II,* 711 A.2d at 80.

11. Because the trial court found no deficient performance, it did not address whether Dobson was prejudiced under the second prong of *Strickland.*

The trial court denied, without a hearing, the second 23–110 motion on the ground that it was a "successive motion for similar relief" to the first 23–110 motion alleging ineffective assistance of counsel. Dobson filed a timely appeal that was consolidated with the appeal from the denial of the first 23–110 motion. In this consolidated appeal, he presents two issues for review: (1) whether the trial court erred in ruling that his trial counsel did not render ineffective assistance by introducing an alibi and alibi witnesses in the opening argument and then failing to put on those witnesses; (2) whether the trial court erred in denying, without a hearing, his second 23–110 motion on procedural grounds.

## II.

### A. *Ineffective assistance of counsel— first 23–110 motion*

■ "For purposes of appellate review, the trial court's determination whether counsel was ineffective presents a mixed question of law and fact." *Frederick v. United States,* 741 A.2d 427, 436 (D.C. 1999) (quoting *Byrd v. United States,* 614 A.2d 25, 30 (D.C.1992)). Under D.C.Code § 17–305, we must accept the trial court's factual findings unless they lack evidentiary support in the record. *See Frederick,* 741 A.2d at 436. The trial court's legal conclusions, however, are reviewed *de novo. See id.* at 437.

To establish a Sixth Amendment violation on the ground of ineffective assistance of counsel under the *Strickland* standard, Dobson "must demonstrate both that counsel's performance was deficient and that [he] suffered prejudice." *Id.* Deficient performance requires a showing that trial counsel "made errors so serious that he was not functioning as the 'counsel' guaranteed him by the Sixth Amendment." *Id.* (quoting *Strickland, supra,* 466 U.S. at

687, 104 S.Ct. 2052). Judicial scrutiny of trial counsel's performance is deferential, and we will not readily second-guess trial counsel's tactical decisions. *Frederick,* 741 A.2d at 437. To show prejudice, Dobson must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

In this case, the trial court ruled that Lipps's decision not to put on the alibi witnesses was a tactical one and that his action did not constitute ineffective assistance of counsel within the meaning of *Strickland.* The court observed:

What we have here, as I said, is an attorney who heard testimony that was so weak he just did not want to go forward and did not feel the need to.

He discussed it with his client. They disagreed. And I am going to but—and I want to make this clear so that the findings—so that if this issue goes up, that it is clear to the Court of Appeals what I am saying.

I am ruling that [Dobson] saying to his lawyer, "I don't like your tactic," when it doesn't involve absolute constitutional issues, like [the] right to testify, et cetera, does not create automatically without more a *Strickland* situation.

Later, the trial judge stated, "I am not finding that [Lipps's] performance was defective."

In *Edwards v. United States,* 767 A.2d 241, 246 (D.C.2001), this court considered the same issue presented here: whether counsel was constitutionally deficient in promising in opening statement to present certain evidence and then failing to present the witnesses who would have supplied that evidence. Edwards had been convicted of second-degree murder of his infant daughter and other crimes. He claimed that his counsel was deficient in that he

promised to put on evidence of the mental condition of his wife, Stacy, who he alleged was responsible for his infant daughter's death, and then failed to call experts to present the evidence.[12] *Id.* We affirmed, holding that Edwards's trial counsel was not constitutionally ineffective, because counsel's course of action was a reasonable tactical choice, and that Edwards did not demonstrate prejudice from his trial counsel's failure to present the evidence he had promised. *Edwards,* 767 A.2d at 251. In so doing, we rejected a *per se* rule that unfulfilled promises in the opening statement constitutes ineffective assistance of counsel, concluding that the determination whether counsel made a reasonable tactical choice under these circumstances is "necessarily fact-based." *Id.* at 248. We observed:

> That determination depends upon such factors as [1] the nature and extent of the promises made in opening statement, [2] any strategic justifications for the subsequent decision not to produce the evidence, [3] the explanation provided the jury for the failure to produce the evidence, [4] the presentation of other evidence supporting the promised theory, and generally, [5] the impact upon the defense at trial and upon the jury.

*Id.*

■ Because we are reviewing an ineffective assistance claim based on an unfulfilled promise, I will address the factors set forth in *Edwards.* The first *Edwards*

factor requires consideration of the nature and extent of Lipps's promise in opening statement. Assuming the witnesses are credible, an alibi is a compelling defense involving "impossibility of [the] accused's presence at the scene of the offense at the time of its commission." *Gethers v. United States,* 556 A.2d 201, 203 (D.C.1989) (quoting *Greenhow v. United States,* 490 A.2d 1130, 1134 (D.C.1985)). Lipps's introduction of the alibi defense was an important portion of the opening argument, planting a seed in the jurors' minds that Dobson could not have robbed Sawyer if he was not in Washington, D.C., on the night of the robbery. In addition, in his October 31, 1980, post-trial memorandum he indicated that he "announced quite fully in opening statement that we would introduce an alibi defense," and "spelled it out in some detail." Thus, the nature and extent of the introduction of the alibi was substantial. Therefore, I conclude that this factor and the fourth factor—lack of other evidence supporting the alibi theory—operate in Dobson's favor. Those factors are not determinative, however, and although the same two factors also were present in *Edwards,* they were not sufficiently weighty by themselves to tip the balance in favor of a finding that counsel was constitutionally ineffective.

More significant is the second *Edwards* factor which, in my view, heavily cuts against Dobson.[13] Lipps explained that

---

12. In the opening statement, Edwards's trial counsel stated, "In order to decide this case, you will need to learn more about Stacy Edwards. The evidence will show that Stacy Edwards is mentally ill. The evidence will show that Stacy Edwards spent the better part of her adult life committed to a mental institution. Stacy Edwards suffers from schizo effective disorder." *Id.* at 248 n. 8.

13. Because the trial transcripts are no longer available, we cannot fully address the third

factor—the explanation, if any, Lipps provided to the jury for not presenting the alibi witnesses. Lipps wrote in the October 31, 1980 post-trial memorandum that after the government raised the absence of the alibi witnesses in its rebuttal closing, Lipps told the jury "we chose not to dignify the government's case with the defense." Lipps's testimony on this point was corroborated by Dobson in his testimony during the hearing on remand. From Dobson's point of view, this factor is, at best, neutral. However, if Lipps's

the government's identification testimony was weaker than expected because Sawyer—who identified Dobson at trial two years and four months after the robbery—admitted that his initial photo identification of Dobson less than three weeks after the robbery was only 40/45 to 60 percent certain. This uncertainty was buttressed by the videotape of the first lineup, which was conducted little more than a month after the offense, in which Sawyer selected two people other than Dobson. I think it fair to say that Sawyer's uncertainty in his trial testimony (as low as 40/45 percent at the photo identification) and his failure to identify Dobson in a lineup two weeks after the photo identification, could give rise to a reasonable belief on Lipps's part that the jury might not credit the in-court identification made more than two years after the robbery. Based on that reasonable belief, Lipps made the tactical decision not to present the alibi witnesses. From our vantage point—over 20 years later and far removed from the events of the trial—I cannot say that Lipps's assessment, that the identification testimony was weak and unconvincing, was wrong or constituted ineffective assistance in the *Strickland* sense. Thus, as I said above, this factor weighs heavily against Dobson's position.

Finally, as to the fifth *Edwards* factor—impact upon the defense and the jury—the prejudice potentially resulting from the presentation of Dobson's alibi defense also weighs against Dobson. At first blush, the substance of Dobson's alibi—testimony that he could not have committed a crime in Washington, D.C., when he was in Baltimore—would seem to argue in favor of presenting the evidence. However, any reasonable effective inquiry by govern-

ment counsel likely would have revealed that the witnesses and Dobson were celebrating what the witnesses called "D–Day"—Dobson's one month anniversary of his release from jail. In the face of what he then considered to be weak, single-witness identification testimony, Lipps concluded that the jury should not learn of Dobson's criminal past, a revelation that likely would be harmful to Dobson's case. I would not second-guess that judgment, because, as this court has recognized on numerous occasions, it is very damaging to the defense case for the jury to learn about the defendant's criminal record. *See Bennett v. United States*, 597 A.2d 24, 27 (D.C.1991) (quoting *Fields v. United States*, 396 A.2d 522, 527 (D.C.1978)) ("The risk from the admissibility of a prior arrest of the defendant is that 'the jury may infer from the prior criminal conviction that the defendant is a bad man and that he therefore probably committed the crime for which he is on trial.' "); *Thompson v. United States*, 546 A.2d 414, 419 (D.C. 1988) (quoting *United States v. Daniels*, 248 U.S.App.D.C. 198, 205, 770 F.2d 1111, 1118 (1985)) ("Once evidence of prior crimes reaches the jury, it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence.").

While Lipps was willing to run the risk of revealing Dobson's criminal past if the identification evidence was strong, it was not unreasonable for him to conclude otherwise when the identification evidence turned out to be much weaker then he anticipated. In these circumstances, his decision to forego the alibi defense was purely a "reasonable tactical choice[] [made] in light of the situation as it appeared at the time .…" *Edwards*, 767 A.2d at 248.

inability to recall the full details of the explanation he gave to the jury is chargeable against Dobson because of the excessive delay

in raising this issue, then this factor also would cut against Dobson's position. *See* note 3, *supra*.

In sum, after weighing the five *Edwards* factors, I agree with the trial court's ruling that Lipps's performance was not deficient within the meaning of *Strickland*.[14] The decision to forego the alibi defense was a reasonable tactical decision for the reasons stated above. I conclude, therefore, that counsel's course of action can not be characterized as conduct "so serious that he was not functioning as the 'counsel' guaranteed him by the Sixth Amendment." *Frederick*, 741 A.2d at 437. Therefore, Lipps's performance did not constitute "ineffective assistance of counsel." Accordingly, the trial court did not err in denying Dobson's motion.

### B. Ineffective assistance of counsel— second 23–110 motion

■ In the second 23–110 motion, Dobson argued that his trial counsel was ineffective for failing to interview and make available for trial James Harris, Dobson's accomplice, who allegedly would have testified that another man was his accomplice on the night of the robbery. The trial court rejected the motion without a hearing as a "successive motion" presenting the same ground for relief as the first motion. *See* D.C.Code § 23–110(e). Because the second motion stated an identical legal basis for relief—ineffective assistance of trial counsel—and because Dobson demonstrates no cause for and prejudice from his failure to raise this ineffective assistance claim in his first 23–110 motion, the trial court did not abuse its discretion in denying the second motion without a hearing. *See Minor v. United States*, 647 A.2d 770, 776 (D.C.1994) (holding that trial court did not abuse discretion in denying,

without a hearing, second 23–110 motion as second or successive motion for similar relief based on ineffective assistance of counsel).

■ As an alternative ground, Dobson contends that even if he is unable to show cause for and prejudice from failing to include his second ineffective assistance claim in his first 23–110 motion, he has produced evidence of actual innocence to overcome any procedural bar under *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). In *Schlup*, the Supreme Court held that a procedural bar can be overcome if the evidence of innocence is "so strong that a court cannot have confidence in the outcome of the trial ...." *Id.* at 316, 115 S.Ct. 851. The evidence that Dobson claims demonstrates actual innocence—a signed, unsworn statement of James Harris, Dobson's accomplice in the armed robbery—does not meet the standard of actual innocence required under *Schlup*.[15] *See Diamen v. United States*, 725 A.2d 501, 512 (D.C.1999) (holding that newly discovered evidence—affidavit by confessed murderer and admitted perjurer—seeking to shift blame for murder to two deceased members of Pagans motorcycle club, does not meet *Schlup* standard). For these reasons, the trial court properly denied the second 23–110 motion as a successive motion for similar relief.

SCHWELB, Associate Judge, concurring:

The offense in this case was committed on June 6, 1978, more than twenty-four years ago. Dobson's § 23–110 motion was filed almost fifteen years after the rob-

---

14. Because I find no deficient performance, I do not address the second prong of *Strickland*, *i.e.*, whether Dobson suffered prejudice.

15. Harris and Dobson were friends; Dobson was the father of Harris's sister's child; Harris has not seen the alleged "other accomplice" since the robbery; and he gave no personal information about the "other accomplice."

bery. At the time of the hearing of the motion, Dobson's trial attorney had little active recollection of what took place at trial and had to rely primarily on a reconstruction based on available written materials.

If Dobson's convictions were now to be vacated so many years after the events in question, it would probably be impossible for the prosecution to present the case again. Such delay is a part of the court's calculus that the court must consider, *see Dobson II, supra*, 711 A.2d at 84, and under all of the circumstances I do not believe that trial counsel's performance was sufficiently deficient to warrant reversal under *Strickland, supra*.

My view of the case, however, is somewhat different from Judge King's. Some of the justifications for trial counsel's tactics in this case strike me as quite unpersuasive. An alibi defense is not an alternative to a defense based on the weakness of identification testimony; on the contrary, the two defenses ordinarily complement each other. A defendant with a strong alibi can argue that of course the identification testimony is weak, because the defendant was not there. Similarly, the weakness of the identification makes alibi evidence more credible.

If the alibi defense in the present case was strong enough for counsel to use his opening statement to promise to present it, then it did not lose its persuasiveness when the prosecution presented somewhat weaker *identification testimony* than had been expected. If, on the other hand, presentation of the defense was risky because it might require disclosure of other criminal activity on Dobson's part, that danger existed at the time counsel made his opening statement.[1] Surely, under those circumstances, the sensible course of action would have been to defer any mention of the alibi defense until it became clear to Dobson's attorney that the benefits of presenting it outweighed its risks, and that counsel therefore ought to use it. If the risk/benefit calculus was uncertain, then a prudent silence at the time of opening statement would have avoided the obviously unfavorable consequence of promising important testimony to the jury and failing to deliver it—a tactic which surely risked undermining the jury's confidence in the reliability of counsel's entire presentation.

I recognize that circumstances often change during a trial, and that almost a quarter of a century after the fact an appellate court has the benefit of 20/20 hindsight. Dobson's attorney, on the other hand, had to make important tactical decisions quickly and while under the considerable pressure of a trial in which counsel's client's long-term liberty was at risk. I cannot say that Dobson's attorney's performance was so deficient that he did not function as the "counsel" guaranteed by the Sixth Amendment. *See Strickland, supra*, 466 U.S. at 687, 104 S.Ct. 2052. But if the prolonged delays which have distorted this litigation had not occurred, and if vacation of Dobson's conviction would not require the government to prove events that took place nearly a quarter of a century ago, then I would regard the correct disposition of this appeal as a close call indeed.

WASHINGTON, Associate Judge, dissenting:

While I agree with Judge Schwelb that this is an extremely close case, I disagree

---

1. Judge King refers to D–Day as "Dobson Day." But June 6, 1978, was also the anniversary of D–Day, June 6, 1944, the date of the invasion of Normandy by the Allies during World War II.

that the pressure faced by counsel at trial or the prolonged delay in the filing of the 23–110 motion necessarily leads to the conclusion that the performance of Dobson's trial counsel was not so deficient as to warrant reversal under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In fact, the concerns raised by Judge Schwelb in his concurring opinion concerning the prejudice to Dobson from his counsel's decision to preview his defense in opening statement and then not produce the promised evidence leads me to conclude that under our decision in *Edwards v. United States*, 767 A.2d 241 (D.C.2001), the trial court's decision to deny Dobson's first 23–110 motion in this case must be reversed.

As Judge King points out in his concurring opinion, we addressed this very issue recently in *Edwards* and therefore the present case must be analyzed under the five-prong test that we articulated in that case. Judge King concludes and I agree that both the first prong, that a promise was made to the jury, and the fourth prong, that no other alibi evidence was presented to the jury, argues in favor of Dobson's motion. I also agree with Judge King that we are hampered by the passage of time in our ability to fully address the third factor, the explanation, if any, given to the jury for the failure of defense counsel to call the promised witnesses. Where we part company, however, is in our analysis of the weight that should be given to the second prong of *Edwards*, the strategic decision prong, and the fifth prong, whether the decision caused substantial prejudice to Dobson given the facts of this case.

Judge Schwelb notes in his concurring opinion that Dobson's alibi defense was entirely consistent with his attack on the credibility of the complaining witness' identification of him as the perpetrator of the crime. It is for this reason that I believe Judge King has given far too much weight to the second *Edwards* prong, the strategic justification for the decision not to produce the evidence, and far too little weight to the other *Edwards* factors that we agree weigh in favor of Dobson. In addition, Judge King appears to improperly conflate the second and fifth prongs of *Edwards* when he concludes that the impact on the jury was minimal because the decision not to offer the evidence was a tactical decision.

In *Edwards*, we cited to the decisions of several federal circuit courts that have held that the failure of defense counsel to produce evidence promised in an opening statement supports a claim of deficient performance of trial counsel sufficiently prejudicial to warrant a new trial. *Id.* at 247. In doing so, we recognized that there are cases where such a promise, coupled with sufficient prejudice from the failure to follow through on that promise, could result in the granting of a new trial. We also once again noted that the determination of ineffective assistance of counsel is necessarily fact based, *id.* at 248, and that all of the *Edwards'* factors must be considered in making that determination. In this case, I submit that the *Edwards* factors argue in favor of reversal.

First, as I pointed out earlier, the alibi defense promised to the jury and the defense ultimately relied upon by defense counsel were entirely consistent. This is not an *Edwards*-type circumstance where the promises made to the jury in opening statement were modified because trial counsel was compelled to explore other strategies when the defendant's version of the events changed. Here, defense counsel was never confronted with new evidence or information that required him to alter his original trial strategy. In fact, defense counsel was well aware of the

risks inherent in presenting Dobson's alibi defense before he made his opening statement to the jury and still he chose to do so. The mere fact that the government's evidence was weaker than expected, although strong enough to withstand a motion for judgment of acquittal, is not a sufficient strategic justification for a change in trial strategy that severely undermines the jury's expectations of what evidence will be presented. The effect of such a break in trust with a jury cannot be underestimated in terms of the potential prejudice to the defendant. For that reason, trial counsel's decision to forgo presenting the testimony of several apparently credible alibi witnesses because he thought the government's case was weak, was a tactical decision that in my opinion should not be given overriding weight in our decision.

With respect to the fifth prong of *Edwards,* the impact on the defense and the jury of the failure to present this alibi testimony, I also respectfully disagree with my colleague's analysis. Judge King appears to argue that because the jury probably would have discovered that Dobson had a prior criminal conviction, either through the direct or cross-examination of the alibi witnesses, the decision not to present those witnesses was a reasonable tactical choice. While that may be an appropriate consideration under the second prong of *Edwards,* I believe the question posed under the fifth prong of *Edwards* is more appropriately analyzed in a manner more consistent with this court's jurisprudence under the second prong of *Strickland.* Thus, the question is not whether Dobson's counsel made a reasonable tactical decision but rather whether Dobson has demonstrated "a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. While reasonable people can disagree on this point, I believe that the failure of Dobson's trial counsel to present the witnesses, whom he promised in opening statement would account for Dobson's whereabouts on the night in question, actually helped to bolster the weak identification evidence offered by the government. While juries are presumed to follow instructions of the trial court, and the trial court properly instructed the jury in this case that the statements of counsel are not evidence, there is little doubt that counsel's failure to follow through on his promised alibi defense created a credibility gap with the jury. When Dobson failed to fill the gap with any evidence supporting an alibi defense, it became much easier for the jury to conclude that he was merely trying to confuse them as opposed to defending himself. Even if we assume that the jury would have learned that Dobson had been incarcerated in the past, it is quite probable, especially given the weak identification evidence tying Dobson to the crime, that had the jury heard the testimony of the proffered alibi witnesses the outcome of the case would have been different.

After applying all five *Edwards* factors to the facts of this case, I believe that trial counsel's promise to the jury to present alibi witnesses and his subsequent failure to present those witnesses or any other evidence in support of his purported alibi defense constituted deficient performance, and that given the weakness of the government's case, there was sufficient prejudice to the defense to warrant reversal. Therefore, I respectfully dissent.